**SECOND DIVISION**
**BARNES, P. J.,**
**MILLER, and RAY, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**October 9, 2013**

# In the Court of Appeals of Georgia

A13A1305.  WARE  v.  AMERICAN  RECOVERY  SOLUTION
SERVICES, INC.

BARNES, Presiding Judge.

American Recovery Solution Services, Inc. (ARSS) sued Christopher Ware for computer theft and computer trespass under the Georgia Computer Systems Protection Act, OCGA § 16-9-90 et seq. (the "Act"). Following a bench trial, the court found that Ware committed computer trespass under OCGA § 16-9-93 (b) and awarded ARSS damages totaling $70,225. Ware argues on appeal that the trial court erred in imposing liability under the Act, in assessing damages, and in awarding attorney fees without identifying the statute on which the award was based or making findings of fact. We agree that Ware committed computer trespass but reverse the

damages award for "past services," and reverse and remand the attorney fees award for further proceedings.

> In the appellate review of a bench trial, this Court will not set aside the trial court's factual findings unless they are clearly erroneous, and this Court properly gives due deference to the opportunity of the trial court to judge the credibility of the witnesses. The standard by which findings of fact are reviewed is the "any evidence" rule, under which a finding by the trial court supported by any evidence must be upheld.

(Citation and punctuation omitted.) *Singh v. Hammond*, 292 Ga. 579, 581 (2) (740 SE2d 126) (2013).

So viewed, the record reveals that ARSS is a collection agency which entered into a written contract with Ware on August 30, 2009. Ware agreed to work as an independent contractor to "design, develop, and implement applications software" according to specifications attached to the contract as "Exhibit A."[1] The contract provided that the software, "including all versions in either source code or object code form," was to be delivered to ARSS no later than February 1, 2010.

---

[1]Exhibit A is not included in the record, nor was it introduced or discussed at trial.

2

In exchange for completing the software development, ARSS agreed to pay Ware $1,500 as a "down payment" and $500 per month "until completion," as well as necessary expenses. The contract provided that ARSS could request changes to the specifications "or other aspects of the Agreement," and that Ware would use his best efforts to implement the requested changes at no additional expense or delay. If he could not do so, ARSS could elect either to withdraw the change request or require Ware to deliver the software with the change, "subject to the delay and/or additional expense." The contract further stated that the software would be the property of ARSS, that the software development was "'work for hire' within the meaning of the Copyright Act of 1976," and that Ware "assign[ed] to [ARSS], without further compensation, all of [his] right, title and interest in and to the Software" and any related intellectual property.

Ware developed software for ARSS that allowed employees to access the company's database using a web-based application. When the parties entered into the August 2009 contract, Ware had already completed about 85 percent of the web-based application. He completed and installed it on ARSS's system at some point before February 2010, as provided in the contract. After the application was installed and working, ARSS and Ware discussed building a faster program, and at some point

3

after February 2010 ARSS accepted Ware's proposal to build a second application based on Windows.

ARSS was still paying Ware for the completed web-based application when he began developing the Windows-based application, and for a time ARSS was paying Ware for both the completed first application and the developing second application. Ware and ARSS's chief financial officer (CFO), who was also a part-owner and the operations manager, worked out a schedule for completing the new application and making payments. ARSS agreed to pay Ware an initial $700 on September 1, 2011, of a total fee of $1,905 due September 30, 2011, but when Ware arrived to pick up the deposit, the check was for $350 instead of $700. Ware agreed to wait two weeks for the second half of the down payment, and on Tuesday, September 13, the CFO told him he would leave the second $350 check at the front desk for Ware to pick up two days later. On Thursday, September 15, 2011, Ware came to ARSS's offices and corrected some bugs in the program, but when he asked for his check, he was told the COO had taken it. The COO explained that she took the check so that she could "ask [Ware] where were we on the remaining portion of what he had." The COO sent Ware an email the next afternoon, Friday September 16, 2011, asking him about the status of the corrections, which Ware had already fixed.

4

Ware responded with what he later described as a "rash reaction," admitting he "mishandled" the situation. First, he logged into ARSS's server remotely, using the CFO's login and password, and "disabled the login." On Friday, September 16, 2011, ARSS could not access its database of 36,000 accounts, and had to adapt temporarily to a manual method of operation. That evening, Ware emailed the company owners, demanding the immediate receipt of the rest of his agreed-upon fee for the latest upgrades before he would allow them access to the application and database.

ARSS called in a software expert who restored access to the server and files. Then on September 23, 2011, Ware again logged into the ARSS server with the CFO's credentials and, according to him, "restored the application and gave them the previous package that they had paid for." When ARSS employees tried to log into the database, they only had access to a previous version of the program which did not include data from 8,000 to 10,000 records that had been input into the newer version.

On Friday, September 30, 2011, ARSS filed a complaint against Ware, contending that Ware remotely accessed ARSS's server, disabled the software he developed under the contract, and deleted files. ARSS asserted that Ware committed computer theft in violation of OCGA § 16-9-93 (a) and computer trespass in violation of OCGA § 16-9-93 (b) and was liable for damages and the costs of suit under OCGA

5

§ 16-9-93 (g). ARSS also claimed to be losing $20,000 a day while its software was down and sought an injunction against Ware requiring him to make all ARSS servers and software operable and provide it with software itself and training manuals as outlined in the August 2009 contract. Finally, ARSS sought attorney fees under OCGA § 9-15-14.

In response to ARSS's motion, the trial court held an emergency hearing the following Monday, October 3, 2011. ARSS's attorney communicated with Ware by email but a process server was unable to serve Ware personally with the lawsuit and he was not present at the hearing. The trial court issued a order restraining Ware from accessing ARSS's servers for 30 days and ordering him to remedy "any problems caused by his past access" and give ARSS the source code and documentation for all versions of the software. The court also set an October 31, 2011 hearing date and directed the clerk to served the order and complaint on Ware.

On October 7, 2011, an attorney entered a notice of appearance for Ware and moved the trial court to set aside the temporary restraining order (TRO) for lack of service and grant him either an indefinite stay of compliance or a temporary stay until his motion to set aside was heard and decided. ARSS responded three days later that "it [was] reasonable to believe that [Ware] did have notice," and noted that personal

6

service was not necessary for the TRO as long as the order was personally served on Ware along with notice of a subsequent hearing. ARSS's counsel submitted an affidavit averring that he had spoken with Ware's employer and that the employer made Ware aware of the hearing, and attached copies of numerous email messages.

The next pleading in the record is ARSS's motion for contempt and attorney fees filed October 11, 2011, alleging that Ware was subject to the court's jurisdiction by being the subject of a TRO and could be served through his attorney. ARSS further contended that Ware had failed to comply with the TRO and should be held in contempt and ordered to pay attorney fees.

It appears from pleadings in the record that the trial court held another hearing, but the record contains no transcript and no resulting order. On October 27, 2011, ARSS filed a second motion for contempt and attorney fees, asserting that the trial court had heard its motion to compel on October 13, 2011, and had ordered Ware to comply by close of business October 14, 2011. The record contains no responsive pleading or order related to that motion.

More than a year later, the trial court placed the case on a civil trial calendar and ordered the parties to appeal for a calendar call. On November 14, 2012, the trial court granted Ware's request to allow his attorney to withdraw, and on November 28,

7

2012 the court conducted a bench trial at which Ware represented himself. On December 14, 2012, the trial court issued an order and final judgment finding that Ware committed computer trespass as defined by OCGA § 16-9-93 (b) and awarding ARSS $22,000 in lost profits, $15,000 reimbursement of all fees it had paid Ware for his services, $15,000 for repairs, $17,875 attorney fees, and $350 punitive damages.

1. Ware contends on appeal that the trial court erred in imposing liability under the Act because he was an "authorized user" and retained ownership rights in the software. The trial court found that Ware committed the offense of computer trespass. OCGA § 16-9-93 (b) defines computer trespass and provides:

> Any person who uses a computer or computer network with knowledge that such use is without authority and with the intention of:
>
> (1) Deleting or in any way removing, either temporarily or permanently, any computer program or data from a computer or computer network;
>
> (2) Obstructing, interrupting, or in any way interfering with the use of a computer program or data; or
>
> (3) Altering, damaging, or in any way causing the malfunction of a computer, computer network, or computer program, regardless of how long the alteration, damage, or malfunction persists

8

shall be guilty of the crime of computer trespass.

OCGA § 16-9-92 (18) defines "without authority" as including "the use of a computer or computer network in a manner that exceeds any right or permission granted by the owner of the computer or computer network." OCGA § 16-9-93 (g) clarifies that someone who is injured due to the violation of any part of time Act has a civil cause of action and can sue for damages, including lost profits.

Ware argues that he did not access the server "without authority" because he owned the software that he tampered with and because he "restored the application and gave them the previous package that they had paid for." But whether Ware "owned" the upgraded version or not is irrelevant to whether he committed computer trespass. The statute only requires that the intruder use a computer or a network knowing he was without authority and either temporarily or permanently remove data, interfere with the use of a computer program, or cause a computer program to malfunction. OCGA § 16-9-93 (b) (1) - (3). The CFO, whose login and password Ware used to access the server, testified that he had not authorized Ware to disable an administrative login or alter the program, and ARSS presented substantial evidence that Ware's actions first completely shut down the company and then hampered its ability to operate for a significant length of time while hired experts

attempted to diagnose and restore the application. Ultimately, the company stopped using Ware's software and purchased the use of off-the-shelf software to conduct its operations because, the CEO testified, it could not risk being shut down again.

Given these facts, the trial court was authorized to conclude that Ware committed computer trespass by accessing ARSS's server without authority and interfering with the use of a computer program.

2. Ware also contends that the trial court erred in its damages award. The Act provides that

> [a]ny person whose property or person is injured by reason of a violation of any provision of this article may sue therefor and recover for any damages sustained and the costs of suit. Without limiting the generality of the term, "damages" shall include loss of profits and victim expenditure[, as well as] any additional civil remedy otherwise allowed by law.

OCGA § 16-9-93 (g) (1), (3). The statute further defines "victim expenditure" as "any expenditure reasonably and necessarily incurred by the owner to verify that a computer, computer network, computer program, or data was or was not altered, deleted, damaged, or destroyed by unauthorized use." OCGA § 16-9-92 (17).

10

Ware asserts that the trial court erred in awarding ARSS $15,000 "for [Ware's] services." Ware argues that this sum was not a permissible "victim expenditure" as defined in OCGA § 16-9-92 (17), because ARSS received the value of Ware's services during those two years, during which Ware developed, installed, and modified the software and provided on-call technical assistance to company employees, as well as the use of the software to operate a large portion of its business. Additionally, Ware argues, he gave ARSS the source code to the second application in response to the trial court's order, which ARSS now owns exclusively, even though the parties' contract only covered the first application. According to Ware, requiring him to pay back all of the money ARSS paid him during this time period would mean it obtained both his services and the software he developed for free.

In response, ARSS argues that the trial court properly awarded it $15,000 "for [Ware's] services" because Ware's actions deprived it of its full "use and enjoyment" of the software it had paid Ware to develop. But the trial court did not award this sum to compensate for the software that Ware developed and which ARSS now possesses; it awarded it as refund of money paid to Ware for his past services, for which the company had already received the benefit of the bargain. ARSS used the applications to run its business and Ware provided technical support and maintenance services to

11

ARSS. The company received value in exchange for the money it paid to Ware, and its cost of compensating Ware during that time period was not an element of damages that resulted from Ware's computer trespass. Accordingly, we reverse the award of $15,000 for Ware's services.

3. Finally, Ware correctly asserts that the trial court erred in failing to specify the statutory grounds upon which it awarded attorney fees or make findings of fact specifying the conduct upon which the award was based. In response, ARSS argues that Ware never objected to the introduction of its attorney fees affidavit at trial and never introduced evidence disputing the amount sought. Thus, ARSS asserts that the evidence demanded the award of attorney fees.[2]

During the trial, at which Ware represented himself, ARSS's counsel stated to the court that "as a preliminary matter," he was entering into evidence his "affidavit of counsel in with the attorney fee matter." The court replied, "Okay," and the exhibit was admitted. There is no indication in the record that counsel showed Ware the affidavit before submitting it, nor was Ware asked if he had any response or objection

---

[2]While ARSS also argues that the parties' August 2009 contract gave ARSS the right to collect the costs of litigation, the contract only provided that Ware would indemnify ARSS for defending against any intellectual property claims related to the software he developed, including attorney fees and costs. No such issues appear in this case.

12

to it. Further, ARSS's counsel never testified about his bill. The trial court simply awarded to ARSS all of the fees listed in counsel's affidavit, without making findings of fact or identifying the code section upon which the award was based.

"Generally, an award of attorney fees is not available in Georgia unless authorized by statute or contract." (Citation and punctuation omitted.) *Ward v. Ward*, 289 Ga. 250, 251 (2) (710 SE2d 555) (2011). When a trial court awards attorney fees to a party, it must specify the statutory basis for the award, and "[w]hen a trial court exercises its discretion in assessing attorney fees and costs of litigation under OCGA § 9-15-14, it is incumbent upon the court to specify the conduct upon which the award is made." *McKemie v. City of Griffin*, 272 Ga. 843, 844-845 (4) (537 SE2d 66) (2000).

In its complaint, ARSS sought attorney fees under OCGA § 9-15-14 "as well as any other statutory or common law basis," and again sought attorney fees in its two subsequent motions for contempt without specifying the statutory basis that would authorize the fees. Although ARSS states in its second contempt motion that the trial court "upheld" the TRO after a hearing and ordered Ware to comply, the record contains no order to that effect. In fact, other than the final order after the bench trial, the only order in the record is the one granting ARSS an ex parte temporary

restraining order on October 3, 2011, three days after suit was filed, and the TRO does not address attorney fees.

In its final order awarding ARSS $17,875 in attorney fees, the trial court erred in failing to make express findings of fact or conclusions of law as to the statutory basis for its award of attorney fees to ARSS. *Woods v. Hall*, 315 Ga. App. 93, 97-98 (2) (726 SE2d 596) (2012).

> More importantly, the court's order fails to even specify whether the attorney fees were awarded under OCGA § 9-15-14 at all, much less which subsection of the statute supports the award. Accordingly, we must vacate this award and remand this case to the trial court for reconsideration of the grant of attorney fees and to make express findings of fact and conclusions of law as to the statutory basis for any such award and the conduct which would authorize it.

(Footnote omitted.) Id. at 98 (2).

*Judgment reversed in part, affirmed in part, and remanded. Miller and Ray, JJ., concur.*

14