[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-13851
_____

D.C. Docket No. 1:13-cv-00206-TWT

ML HEALTHCARE SERVICES, LLC,

Interested Party - Appellant,

ROBIN HOUSTON,

Plaintiff - Appellant,

versus

PUBLIX SUPER MARKETS, INC.,

Defendant - Appellee.

_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

(February 7, 2018)

Before TJOFLAT and JULIE CARNES, Circuit Judges, and CONWAY,[*] District Judge.

JULIE CARNES, Circuit Judge:

This is a personal injury case arising from plaintiff Robin Houston's slip and fall at a Publix Supermarket operated by Defendant. Following an eight-day trial, the jury returned a verdict in favor of Defendant. Plaintiff and third-party ML Healthcare appeal, claiming that the district court erred by requiring ML Healthcare to produce, and then by admitting at trial, evidence of collateral source payments made by ML Healthcare on Plaintiff's behalf. Plaintiff further contends that the district court erred by denying her motion for sanctions based on Defendant's alleged spoliation of evidence. We find no error, and thus **AFFIRM** the entry of judgment in Defendant's favor.

## BACKGROUND

On July 24, 2012, Plaintiff was shopping at a Publix Supermarket in McDonough, Georgia, when she slipped and fell in the dairy aisle. Plaintiff sued Defendant in state court, alleging that she had slipped on liquid that had been left in the aisle and that her subsequent fall had caused serious medical injuries. Defendant removed the case to federal court on the ground of diversity jurisdiction. Following an eight-day trial, the jury returned a verdict in favor of Defendant.

---

[*] The Honorable Anne C. Conway, United States District Judge for the Middle District of Florida, sitting by designation.

During the litigation, Defendant conducted discovery concerning the relationship between Plaintiff, her treating doctors, and third-party ML Healthcare. Through its discovery, Defendant learned that ML Healthcare is a "litigation investment" company that contracts with doctors to provide medical care for injured people with viable tort claims who lack medical insurance. Pursuant to the contracts, ML Healthcare purchases at a discounted rate from these physicians the medical debt that the putative plaintiffs incur during their treatment. But the contract also allows ML Healthcare the right to later recover the full cost of the medical care provided out of any subsequent tort settlement or judgment the treated individuals receive. The discovery showed that ML Healthcare had entered into such agreements with Plaintiff and the treating doctors who would testify at her trial concerning the extent and cause of her medical injuries.

Defendant sought to introduce at trial evidence of the relationship described above to show that Plaintiff's doctors were biased in their testimony and that Plaintiff's claimed medical expenses were unreasonable. In connection with its efforts, Defendant served subpoenas on ML Healthcare requiring it to provide testimony at trial. Plaintiff and ML Healthcare objected to the admission of such evidence, arguing that it was unfairly prejudicial and barred by Georgia's collateral source rule. Plaintiff filed a motion *in limine* to exclude the evidence related to ML Healthcare, and ML Healthcare moved to quash the subpoenas it had received.

3

The district court denied Plaintiff's motion *in limine*, ruling that the ML Healthcare evidence could be admitted for the limited purposes identified by Defendant.  The court also denied in part ML Healthcare's motion to quash, requiring ML Healthcare to appear and provide evidence at trial.

Plaintiff and ML Healthcare appeal the district court's rulings on the motion *in limine* and the motion to quash.  In addition, Plaintiff appeals the district court's denial of her motion for sanctions based on Defendant's alleged spoliation of evidence: specifically, its destruction of video from the McDonough Publix for all but the one hour immediately surrounding Plaintiff's accident.

## DISCUSSION

### I.    Standard of Review

We review the evidentiary and sanctions rulings at issue in this appeal under the abuse of discretion standard.  *See United States v. Clay*, 832 F.3d 1259, 1314 (11th Cir. 2016) ("The district court has broad discretion to determine the relevance and admissibility of any given piece of evidence." (internal quotation marks omitted)); *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 943 (11th Cir. 2005) ("We review the district court's decision regarding spoliation sanctions for abuse of discretion.").  Likewise, we apply the abuse of discretion standard to the district court's denial in part of ML Healthcare's motion to quash.  *See In re Hubbard*, 803 F.3d 1298, 1307 (11th Cir. 2015) ("We review a district court's

4

decision on whether to quash a subpoena only for an abuse of discretion.").

Applying that standard, we will only reverse if we find that "the district court has

made a clear error of judgment, or has applied the wrong legal standard."

*Eghnayem v. Boston Sci. Corp.*, 873 F.3d 1304, 1313 (11th Cir. 2017) (internal

quotation marks omitted).

## II. <u>Impeachment of Treating Physicians with Evidence Concerning ML Healthcare's Payments</u>

### A. **Collateral Source Rule and District Court Ruling**

When a tort plaintiff has been compensated by her health insurer, or other

non-defendants, for injuries that have been caused by the defendant, the question

arises whether the plaintiff can recover those expenses for which she has already

been reimbursed. The collateral source rule provides that the plaintiff is entitled to

recover those already-reimbursed expenses. Georgia follows the collateral source

rule, which:

> gives [a plaintiff] the right to recover damages undiminished by collateral benefits. It refuses credit to the benefit of a tortfeasor of money or services received by the plaintiff in reparation of the injury or damage caused which emanate from sources other than the tortfeasor.

*Polito v. Holland*, 258 Ga. 54, 55 (1988). "The collateral source rule, stated

simply, is that the receipt of benefits or mitigation of loss from sources other than

the defendant will not operate to diminish the plaintiff's recovery of damages." *Id.*

(citation omitted). "If a windfall must be had, it will inure to the benefit of the

5

injured party rather than relieve the wrongdoer of full responsibility for his wrongdoing."[1]  *Broda v. Dziwura,* 286 Ga. 507, 508 (2010).

Given this prohibition against a credit to the defendant for expenses already recovered by the plaintiff, it follows that evidence of collateral benefits is inadmissible "if the only proposition for which it is offered is in reduction of damages, because it is then offered to help prove a proposition which is not a matter in issue."  *Polito*, 258 Ga. at 56.  On the other hand, the Georgia Supreme Court has recognized that "there may be another issue in a case to which evidence of collateral benefits is material."  *Id.*  When that happens and the evidence is admitted for that other purpose, the court should nonetheless "charge the jury that collateral benefits shall not reduce damages the tortfeasor is otherwise liable to pay."  *Id.*  Indeed, Georgia appellate courts have recognized that evidence of collateral benefits received by the plaintiff may be admissible for impeachment purposes when a witness gives false evidence relating to a material issue in the case.  *Kelley v. Purcell,* 301 Ga. App. 88, 90 (2009) (citing *Warren v. Ballard*, 266 Ga. 408, 410 (1996)).  In short, under Georgia law, evidence of collateral benefits is not typically admissible in a personal injury tort case unless that evidence serves

---

[1]  Of course, it is not always the case that a plaintiff will actually gain the windfall of a double recovery.  Under certain circumstances, a health insurer may have the right of subrogation, meaning that the insurer will sometimes be able to claw back from the plaintiff's recovery some of the medical expenses it has reimbursed.  *See Coventry Health Care of Missouri*, *Inc. v. Nevils*, __ U.S. __, 137 S. Ct. 1190, 1197 (2017) ("When a carrier exercises its right to either reimbursement or subrogation, it receives from either the beneficiary or a third party 'payment' respecting the benefits the carrier had previously paid.")

a valid evidentiary purpose other than just revealing to the jury those benefits. When that occurs and the evidence is admitted, the trial court should instruct the jury about the limited purpose of the evidence and, in particular, remind the jury not to consider the collateral payments to reduce its award of reasonable and necessary medical expenses.

Plaintiff and ML Healthcare argue that the collateral source rule was violated in this case as a result of the district court's orders requiring ML Healthcare to produce—and admitting at trial— evidence concerning payments made by ML Healthcare to Plaintiff's treating doctors. As noted, the district court denied the motion, in part, ruling that this evidence could be admitted for only two limited purposes: (1) to attack the credibility of the causation opinions proffered by Plaintiff's doctors and (2) to challenge the reasonableness of Plaintiff's claimed medical expenses. As discussed below, we conclude that the district court did not abuse its discretion.

### B.    Choice of Law

The district court concluded that the business model used by ML Healthcare, which included the fronting of medical expenses for plaintiffs to the treating doctors that ML Healthcare had selected, was "highly relevant and probative" as to the bias of those doctors, as well as the reasonableness of the medical bills. This conclusion led naturally to the district court's evidentiary ruling that the doctors

could be impeached with evidence of this relationship between themselves, ML

Healthcare, and the patients ML Healthcare had referred.

In federal diversity actions, state law governs substantive issues, but federal

law governs procedural issues. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

*See also McDowell v. Brown*, 392 F.3d 1283, 1294–95 (11th Cir. 2004); *Adams v.*

*Lab. Corp. of Am.*, 760 F.3d 1322, 1328 n.8 (11th Cir. 2014). Further, "[r]ules of

procedure encompass rules of evidence, and therefore, the Federal Rules of

Evidence, not state evidentiary rules, apply" to evidentiary disputes in a federal

diversity action. *McDowell*, 392 F.3d at 1294.

Although Georgia's collateral source rule is a substantive rule of damages, it

also has procedural evidentiary implications. The substantive component of the

rule, which prohibits the reliance on collateral source payments to reduce a

plaintiff's damages award, is binding on a federal court sitting in diversity. As a

procedural ruling, an evidentiary ruling deciding whether particular evidence runs

afoul of this state substantive rule will typically be governed by federal evidence

law. *See McDowell*, *supra.*

Nevertheless, we have recognized that "[s]ome state evidentiary rules are

substantive in nature, and transcend the substance-procedure boundary," *id.* at

1295, meaning that sometimes a state's evidentiary rule can trump a federal

evidentiary rule. In fact, we have explored a somewhat similar phenomenon in a

case involving the Alabama collateral source rule. In *Southern v. Plumb Tools*, *A Division of O'Ames Corporation*, 696 F.2d 1321 (11th Cir. 1983), the plaintiff had been injured on the job when a shard of metal flew off a hammer. He sued the manufacturer of the hammer. During the federal litigation, his employer's workmen's compensation carrier sought to intervene in the action to recover the money it had paid the plaintiff for his resulting disability. *Id.* at 1322. But absent some limitations, the carrier's participation in the case would necessarily reveal the fact that the plaintiff had already been paid in part for his injuries. As it happens, Alabama law had anticipated the possibility of intervention by an insurance carrier and allowed that intervention so long as conditions were imposed on its participation. *Id.* In fact, the plaintiff did not object to intervention so long as the court imposed these limitations, which presumably would have helped to shield evidence of the payment of the compensation benefits from the jury. *Id.* at 1323. But in allowing the intervention, the federal district court refused to impose any limitations. *Id.* at 1322, 1323.

We reversed. In the first place, the Alabama limitations on an intervenor's participation did not further, or undermine, any federal evidentiary or civil rule. *Id.* at 1322 (noting that Fed. R. Civ. P.(24(b) permits a court to condition intervention). Second, recognizing that the Alabama collateral source rule was a state substantive law—which must be applied by a federal court in a diversity

action—we also recognized that a procedural ruling permitting intervention would undermine this state substantive law. *Southern*, 696 F.2d at 1323. Further, we could "identify no strong federal interest requiring us to uphold a procedural ruling that severely undermines Alabama's substantive law." *Id*. Indeed, we noted that "Alabama strictly adheres to the collateral source rule with respect to insurance payments and workmen's compensation benefits, and *any* showing that plaintiff has received such payments constitutes reversible error." [2] *Id.* (emphasis in original). Ergo, any mention of the plaintiff's prior receipt of compensation for her injuries would violate this substantive state law, transforming the procedural ruling that essentially revealed this compensation into a ruling that ran afoul of Alabama's substantive law.

Contrary to Alabama law, Georgia law does not create a substantive evidentiary rule that bars the admission of collateral source payments under all circumstances. *See Polito*, 258 Ga. at 56. Rather, Georgia law recognizes that there can be circumstances in which evidence of these payments is admissible. Indeed, in *Polito*, the Georgia Supreme Court helpfully outlines the dichotomy between the substantive component and the procedural component of its collateral source rule. Noting that "[s]ubstantive law is that law which creates rights, duties,

---

[2] Alabama has since statutorily overruled its common law collateral source doctrine. *See* Ala. Code § 12–21–45. Evidence of collateral source payments is now not only admissible as an evidentiary matter, but it can also be used by a jury to discount its damages award to the plaintiff. *See Crocker v. Grammer*, 87 So. 3d 1190, 1193 (Ala. Civ. App. 2011).

and obligations . . . [whereas] [p]rocedural law is that law which prescribes the methods of enforcement of rights, duties, and obligations," *Polito* described the collateral source rule as "primarily substantive in nature." *Id.* at 55. That is, "[i]t gives a party the right to recover damages undiminished by collateral benefits. It refuses credit to the benefit of a tortfeasor of money or services received by the plaintiff in reparation of the injury or damage caused which emanate from sources other than the tortfeasor." *Id.*

The above principle represents the substantive component of the collateral source rule. *Id.* at 56. The court noted, however, that there is also an "evidentiary" consequence of the rule. "Because of the substantive consequence of the rule, evidence of collateral benefits is not *generally* material." *Id.* (emphasis added). This is so because as "a result of the interaction between the collateral source rule and a rule of evidence," evidence of collateral benefits will not typically be material in a damages case, given the existence of a substantive rule that disallows the setting off of collateral benefits against damages. *Polito*, 258 Ga. at 56.

The Georgia Supreme Court made clear, however, that the inadmissibility of collateral benefits is not always required by Georgia's collateral source rule. "Certainly [the immateriality of collateral benefits] is true if the only proposition for which it is offered is in reduction of damages, because it is then offered to help prove a proposition which is not a matter in issue . . . . The substantive collateral

11

source rule removes the proposition as an issue in the case and the evidence rule of materiality precludes proof of collateral benefits." *Id.* But the court goes on to note: "Of course, there may be another issue in a case to which evidence of collateral benefits is material. When such evidence is admitted on another issue it is proper to charge the jury that collateral benefits shall not reduce damages the tortfeasor is otherwise liable to pay." *Id.*

In short, unlike the Alabama collateral source rule at issue in *Southern*, Georgia's rule is not an all-or-nothing proposition. Evidence concerning the receipt of collateral benefits will likely be inadmissible most of the time, but sometimes admission will be proper. Translated: as *Polito* defined it, the substantive Georgia rule provides that a tortfeasor will not receive a set-off on the damages it has caused based on the payment of part or all of those damages by a third party. But deciding whether proffered evidence is offered for the above proscribed purpose versus a legitimate evidentiary use requires an evidentiary ruling. That evidentiary decision is a procedural one and when made in a federal court, federal law controls.[3] *Accord Fitzgerald, P.P.A. v. Expressway Sewerage*

---

[3] The analysis likely would be the same under Georgia evidentiary law. *See State v. Jones*, 297 Ga. 156, 158 (2015) (noting that the evidentiary relevance and prejudice provisions in the Georgia Evidence Code "track their federal counterparts" and are interpreted similarly). And indeed, as set out *supra*, Georgia courts have approved the admission of evidence of collateral benefits for impeachment purposes. Nevertheless, "we must determine as a threshold matter whether to apply state of federal law" in this diversity action. *Flury*, 427 F.3d at 943.

*Const.*, *Inc.*, 177 F.3d 71, 74 (1st Cir. 1999) (reaching the same conclusion with respect to Massachusetts's collateral source rule).

### C.    Admissibility of Evidence for Purposes of Showing Bias[4]

Defendant asserted a theory of bias in this case stemming from ML Healthcare's business model and the incentives it creates for the treating doctors who testify on behalf of their patients.  As explained above, ML Healthcare matches injured, uninsured plaintiffs who have viable tort claims with treating doctors.  It then purchases at a discounted rate the medical bills these doctors generate.  To recoup its investment and make a profit, its contract with the plaintiffs permits ML Healthcare to recover the full amount of these bills from any tort damages recovered by the plaintiffs.  The contract also provides that the referred plaintiffs will personally repay ML Healthcare the full amount of the bills if they recover no damages or if there are insufficient damages to cover the bills. In short, the contract allows ML Healthcare to recover the difference between the

---

[4]  In addition to attacking the district court's assessment of the bias issue, Plaintiff contends that the district court erred at the outset by holding that ML Healthcare was not even a collateral source.  We do not read the district court's rulings as holding that evidence concerning ML Healthcare was not subject to the collateral source rule.  During the telephonic conference in which the district court orally denied Plaintiff's motion *in limine*, the court merely noted that it did not think that "the payments being made by [ML Healthcare] in this case are traditional collateral source payments" but it stated that "even so" Plaintiff's motion would be denied because the evidence was otherwise admissible on valid grounds.  Likewise, in the district court's subsequent written order, the court noted that ML Healthcare is not a "traditional" collateral source, but again based its ruling on the admissibility of the evidence.  Further, Defendant concedes that the evidence concerning ML Healthcare's payments implicates the collateral source rule.  Thus, for purposes of this appeal, we will assume that ML Healthcare is a collateral source.

13

discounted bills it pays treating doctors and what those doctors say is the full value of those medical services: either from the plaintiffs themselves or from any tort recovery the plaintiffs receive. Nonetheless, a plaintiff who recovers insufficient damages to pay back ML Healthcare may be unable or unwilling to repay her debt, meaning that, absent a recovery by the plaintiff in such cases, ML Healthcare will be out not only its investment, but also any hoped-for profit. Thus, for its business model to flourish, ML Healthcare needs the plaintiffs whom it subsidizes to win their lawsuits.

According to Defendant, this arrangement creates the risk of bias on the part of doctors who receive referrals from ML Healthcare and who subsequently testify on behalf of the plaintiffs they have treated pursuant to those referrals. This is so, Defendant contends, because if a doctor did not provide a favorable causation analysis—which is necessary to win a tort action—ML Healthcare likely would find other doctors who would. Thus, to continue to receive referrals from ML Healthcare—and the guaranteed income stream they generate—the treating doctors have an incentive to provide analyses that help these patients—and, by extension, ML Healthcare—win their cases.

The district court did not abuse its discretion in crediting this argument, and thus permitting evidence of ML Healthcare's payment arrangement to be admitted for the limited purpose of showing bias on the part of the doctors who testified in

14

this case.  First, the evidence was relevant.  Indeed, proof of bias will typically be relevant.  *See United States v. Abel*, 469 U.S. 45, 52 (1984) ("Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony.").  The fact that the evidence also implicates the collateral source rule does not render it irrelevant "for impeachment purposes."  *Barrera v. E. I. Du Pont De Nemours & Co., Inc.*, 653 F.2d 915, 921 (5th Cir. Unit A 1981) (holding that "evidence, properly offered and clearly relevant for impeachment purposes, was improperly excluded simply because, under the collateral source rule, it would have been inadmissible as direct evidence").[5]

Plaintiff points out that none of her doctors admitted to bias while testifying in the case.  That is true, but hardly a surprising revelation.  A witness's refusal to admit bias does not bar the opposing party from introducing evidence that might contradict such a protestation.  At any rate, Defendant does not need to be able to prove a premeditated plan of deceit in order to probe potential bias.  *See United States v. Phelps*, 733 F.2d 1464, 1472 (11th Cir. 1984) (noting that a "presumption favors free cross-examination on possible bias, motive, ability to perceive and

---

[5]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.  *Barrera* was decided in August of 1981.

15

remember, and general character for truthfulness"). Instead, Defendant needed only to show that ML Healthcare's payment arrangement had "any tendency" to make bias more probable than it would be without the evidence. *See* Fed. R. Evid. 401(a). That requirement is easily satisfied here. A jury might infer that Plaintiff's doctors were incentivized by ML Healthcare's referral and payment arrangement to provide testimony that was more favorable to Plaintiff than it otherwise would have been. If so, the jury would have found bias, which is clearly a relevant consideration in evaluating a witness's credibility.

Second, the district court did not commit a clear error of judgment or apply the wrong legal standard in ruling that the probative value of the ML Healthcare evidence outweighed any potential for prejudice under Rule 403 of the Federal Rules of Evidence. Rule 403 provides for the exclusion of relevant evidence when "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. But exclusion of relevant evidence under Rule 403 is "an extraordinary remedy that should be used sparingly" and only after looking at the evidence "in the light most favorable to its admission." *United States v. Flanders*, 752 F.3d 1317, 1335 (11th Cir. 2014) (internal quotation marks omitted), *cert. denied*, 135 S. Ct. 1188 (2015), *reh'g denied*, 135 S. Ct. 1757 (2015). Applying that standard, there simply is no basis for finding that the district court abused its discretion.

16

The potential for prejudice arising from admission of the ML Healthcare evidence is that the evidence might have been considered in a way that runs contrary to Georgia's collateral source rule. In other words, the jury might have concluded from the evidence that Plaintiff had already been compensated for her injuries and, thus, reduced her damages award. But any such prejudice could have easily been mitigated by an explanation that Plaintiff remained personally liable to ML Healthcare for the full value of the medical care provided by her treating doctors, regardless of any damages she received. And, indeed, Plaintiff's counsel advised the jury of this fact during his opening statement. If counsel was concerned that there was any confusion about this issue, he could have elaborated further or taken other steps to ensure that the jury completely understood Plaintiff's outstanding financial obligations under her agreement with ML Healthcare.

With Plaintiff's full outstanding liability explained, there is no reason to think the jury would find it unnecessary to compensate Plaintiff because a portion of her medical bills had been paid by ML Healthcare. The purpose of the collateral source rule is to ensure that a tortfeasor is not allowed to benefit from its wrongful conduct simply because a plaintiff's bills have been paid by some other party. *See Hoeflick v. Bradley*, 282 Ga. App. 123, 124 (2006). The jury presumably understood that plaintiff's bills were still due in full, and that any damages award should therefore not be reduced as a result of ML Healthcare's payments.

17

Finally, the district court properly instructed the jury about the collateral source rule and directed the jury not to reduce any damages it might award on account of ML Healthcare's payments. "Few tenets are more fundamental to our jury trial system than the presumption that juries obey the court's instructions." *United States v. Stone*, 9 F.3d 934, 938 (11th Cir. 1993). "Indeed, the presumption that juries follow their instructions is necessary to any meaningful search for the reason behind a jury verdict. This presumption is, therefore, almost invariable." *Id.* (internal quotations, citations, and alterations omitted). In short, the district court's jury instruction was sufficient to ensure that the ML Healthcare evidence admitted to show bias on the part of Plaintiff's doctors would not be used in an unfairly prejudicial manner in violation of Georgia's collateral source rule.

### D. Admissibility of ML Healthcare Evidence for the Purpose of Contesting the Reasonableness of Plaintiff's Claimed Medical Bills

The district court also allowed Defendant to introduce ML Healthcare evidence to attack the reasonableness of Plaintiff's claimed medical expenses. In support of admitting the evidence for this purpose, Defendant argued that the doctors who received referrals from ML Healthcare improperly inflated their bills in an effort to aid ML Healthcare and themselves. These bills were the basis for a plaintiff's damages request in the subsequent litigation and also set the level of debt to which the plaintiff remained liable to ML Healthcare. Thus, Defendant

18

argued, the higher the billed price the greater the benefit to ML Healthcare. Similar to Defendant's bias argument, the unreasonable expenses argument also rests somewhat on the assumption that the doctors provided this benefit in an effort to ensure that they continued to receive referrals from ML Healthcare.

As it turns out, Defendant ultimately did not use the ML Healthcare evidence to challenge the reasonableness of the medical bills. That being so, and because there was a valid ground for the admission of the ML Healthcare evidence—to show bias—we do not have to determine whether admissibility of the evidence to challenge the reasonability of the expenses was proper.

## E.    Use of ML Healthcare Evidence Outside the Scope of the District Court's Order

In addition to the ML Healthcare evidence admitted in accordance with the district court's ruling on Plaintiff's motion *in limine*, defense counsel twice made statements that implicated collateral source evidence in a manner inconsistent with the contours of the district judge's limited ruling. First, Defendant's counsel made the following remarks during his opening statement:

> [Plaintiff's counsel] said ML is really just like an insurance company except that they don't get paid a premium, they get paid at the end. Well, I would suggest to you that that's entirely different. That's called an investor, and that's what ML is. And fortunately for [Plaintiff], the bulk of the medical expenses have been paid by ML. So it's not really [Plaintiff] who's at risk. It's ML. And if you make a bad investment, sometimes you take a loss.

19

This line of argument has nothing to do with potential bias in the causation opinions offered by Plaintiff's doctors nor does it seek to cast doubt on the reasonableness of Plaintiff's medical expenses.

The second instance occurred during the closing moments of Plaintiff's cross-examination:

> Q: And you understood that there was going to be a relationship between ML Healthcare and these medical providers such that at least for some period of time the money would flow from ML to the providers and you weren't going to have to pay for it?
>
> A: I'm sorry, but could you repeat that question.
>
> Q: Well, let me ask you this. Have you paid Dr. Ugwonali?
>
> A: No.
>
> Q: Have you paid Dr. Chitale?
>
> A: No.
>
> Q: Have you paid –
>
> A: Well, Dr. Chitale was paid through my insurance.
>
> Q: The first portion of Dr. Chitale was before the involvement of ML?
>
> A: Yes.
>
> Q: Okay. He was a Neil Flit referral, but at that point in time you still had your CIGNA insurance?
>
> A: That's correct.
>
> Q: And at some point did ML then transition into the latter portion of the Chitale treatment?

20

A: Yes.

Q: Okay. So after the involvement of ML, you have not paid Hunter, you have not paid Ugwonali, you have not paid Chitale, you have not paid for therapy, you have not paid for prescriptions; is that correct?

A: That's correct.

Q: And is it your understanding that were you to receive a verdict and judgment in this lawsuit against Defendant for a sum for medical expenses, pharmacy expenses and the like greater than the amount that ML actually paid to these medical providers that they get to keep the difference?

A: I have no idea.

Q: You don't know what your obligations are with ML, do you, ma'am?

A: I know that I am obligated to reimburse them for my medical expenses after this—after the lawsuit should I win, but that's really what I know.

Q: And if you don't win, that's ML's loss, isn't it?

A: I would say so.

Once again, this line of questioning strays outside the scope of the district court's delineated collateral source boundaries.

Nevertheless, the admission of these statements does not constitute reversible error.  First, Plaintiff did not object when the statements were made at trial, as required to preserve the issue for appeal under Federal Rule of Evidence 103.  *See United States v. Wilson*, 788 F.3d 1298, 1313 (11th Cir. 2015), *cert.*

21

*denied*, 136 S. Ct. 518 (2015).  Plaintiff contends that the district court's denial of her initial motion *in limine* was sufficient to preserve the objection for appeal.  A motion *in limine* may preserve an objection when the district court has "definitively" ruled on the matter at issue.  *Tampa Bay Water v. HDR Eng'g*, *Inc.*, 731 F.3d 1171, 1178 (11th Cir. 2013).  But "if the opposing party violates the terms of the initial ruling, objection must be made when the evidence is offered to preserve the claim of error for appeal.  The error, if any, in such a situation occurs only when the evidence is offered and admitted."  Fed. R. Evid. 103 advisory committee's note to the 2000 Amendments.  *See also Frederick v. Kirby Tankships*, *Inc.*, 205 F.3d 1277, 1285 (11th Cir. 2000) ("Generally, a party must object to preserve error in the admission of testimony, even when a party or a court violates an in limine ruling.").

Because Plaintiff failed to object to the two statements quoted above, we review their admission for plain error.  *See United States v. Azmat*, 805 F.3d 1018, 1045 (11th Cir. 2015).  "For the admission of evidence to constitute plain error, the evidence must have been so obviously inadmissible and prejudicial that, despite [the opposing party's] failure to object, the district court, *sua sponte*, should have excluded the evidence."  *United States v. Williams*, 527 F.3d 1235, 1247 (11th Cir. 2008) (internal quotations omitted).  Though the statements are arguably irrelevant in light of the collateral source rule, they were not so clearly prejudicial to Plaintiff

that the district court erred in failing to *sua sponte* exclude or strike them. As discussed above, Plaintiff's counsel was able to mitigate the import of these statements by explaining that Plaintiff remained liable for the full amount of her medical bills regardless of the outcome of the trial. Given that explanation, the jury would have no reason to diminish Plaintiff's damages award on the assumption that she had already been compensated for her injuries. Further, Defendant did not directly argue that the jury should diminish any damages award in this manner; it only provided the context of ML Healthcare's payment arrangement and implied that ML Healthcare, rather than Plaintiff, was at risk in the lawsuit.

Finally, the statements are pertinent only to the proper measure of damages. Again, prejudice from these statements would only arise if the jury concluded that it should reduce Plaintiff's damages award because ML Healthcare was footing the bill: a conclusion that would violate the collateral source rule. But the jury never reached the damages question because it determined that Defendant was not liable for Plaintiff's injuries in the first place. For this additional reason, the admission of these statements into evidence was harmless.

## III.    ML Healthcare's Motions to Quash

ML Healthcare was subpoenaed twice during the litigation to provide evidence related to its business model and payment arrangement with Plaintiff. In

both instances, ML Healthcare filed a motion to quash the subpoena. The district court granted in part and denied in part both motions. ML Healthcare appeals the district court's decision not to quash the subpoenas in whole.

The decision whether to quash a subpoena is governed by Federal Rule of Civil Procedure 45(d)(3).[6] That rule provides that a district court must quash a subpoena that: "(i) fails to allow a reasonable time to comply; (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c); (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or (iv) subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A).[7] ML Healthcare does not assert any temporal or geographic problem with the subpoena, and does not claim that it was subject to an undue burden by the subpoena. Nor does it raise any formal legal privilege. Instead, it asserts that "the information sought was protected by the collateral source rule." However, evidence that may implicate the collateral source rule is not "protected material" as

---

[6] The district court ruled on ML Healthcare's motion to quash before the latest amendments to the Federal Rules of Civil Procedure took effect on December 1, 2013. The amendments did not change the substance of the provisions of Rule 45 at issue here, only their numbering. Thus, to avoid confusion, we will use the post–2013 numbering.

[7] Rule 45(d)(3) provides that a district court *may* quash a subpoena that requires "(i) disclosing a trade secret or other confidential research, development, or commercial information; or (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party." Fed. R. Civ. P. 45(d)(3)(B). ML Healthcare initially objected to the discovery subpoena on confidentiality grounds, resulting in an order that documents produced under the subpoena "shall only be shared and used within this civil action and must be filed under seal." ML Healthcare does not challenge that order or otherwise assert the confidentiality objection in this appeal.

24

contemplated by Rule 45(d)(3).  *See* Fed. R. Civ. P. 45(e)(2) (describing the information an entity must provide when "withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material").

Furthermore, Rule 45 does not set forth "inadmissibility" as a ground for quashing a subpoena.  The admissibility or relevance of a piece of evidence could be pertinent to an undue burden analysis, but again ML Healthcare does not assert that the production was unduly burdensome.  To the extent ML Healthcare intended to assert such an argument, it provides no indication of the money, time, work-hours, or other cost that it faced in complying with the subpoena.  Moreover, the evidence sought under the subpoena was admissible to impeach the causation analysis of Plaintiff's treating doctors and was potentially relevant to challenge the reasonableness of her claimed medical expenses.  Thus, any implied undue burden argument fails.

In short, there is no basis for finding that the district court abused its discretion by denying in part ML Healthcare's motion to quash.

## IV.     Spoliation Sanctions

The last issue on appeal concerns the alleged spoliation of video evidence concerning Plaintiff's accident.  Approximately twelve days after the accident, Plaintiff's original counsel sent two letters to Defendant requesting that Defendant

preserve and produce video of the "[s]lip and fall involving [Plaintiff] on or about July 24, 2012." Several days later, Plaintiff's newly retained counsel sent a third letter to Defendant requesting the preservation and production of "all video media from every camera at the subject Publix store" from July 12, 2012 through August 14, 2012. Plaintiff's counsel subsequently sent another letter to Defendant requesting "a copy of the video media captured by the camera at the rear of aisle 13 on July 24, 2012 at [the subject Publix store]." Despite these letters, Defendant only preserved one hour of video related to Plaintiff's accident. That portion of video, which included the thirty minutes prior to and the thirty minutes after Plaintiff's accident, was automatically and immediately preserved pursuant to Defendant's video retention policy. The remainder of the video was erased in the usual course of business.

Plaintiff moved for spoliation sanctions, including (1) an adverse inference instruction or (2) a ruling precluding Defendant's witnesses from testifying that the aisle had been cleaned or inspected prior to Plaintiff's fall. The district court denied both requests, agreeing with Defendant that it had no duty to preserve any more video than what was provided to Plaintiff, and that the destruction of the video was not undertaken with the necessary state of mind to warrant sanctions.

26

## A.    Applicable Standard

In *Flury v. Daimler Chrysler Corporation*, this Court held that "federal law governs the imposition of spoliation sanctions" but at the same time observed that federal law does not set forth "specific guidelines" to determine when such sanctions are warranted. *Flury*, 427 F.3d at 944.  The Court thus borrowed a multi-factor test from Georgia spoliation law, which it found to be "wholly consistent with federal spoliation principles." *Id.*  The factors identified by the Court in *Flury* as relevant to the inquiry include:  (1) whether the party seeking sanctions was prejudiced as a result of the destruction of evidence and whether any prejudice could be cured, (2) the practical importance of the evidence, (3) whether the spoliating party acted in bad faith, and (4) the potential for abuse if sanctions are not imposed.  *See id.* at 945.

In December 2015, Rule 37 of the Federal Rules of Civil Procedure was amended to address the spoliation of electronically stored information like the video at issue here.  *See* Fed. R. Civ. P. 37(e).  Rule 37 now provides:

> **(e)**    **Failure to Preserve Electronically Stored Information**. If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
>> **(1)**    upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

27

**(2)**    only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

> **(A)**    presume that the lost information was unfavorable to the party;
>
> **(B)**    instruct the jury that it may or must presume the information was unfavorable to the party; or
>
> **(C)**    dismiss the action or enter a default judgment.

*Id.*

We have not yet had the opportunity to determine whether, given the above amendment, the multi-factor test relied upon in *Flury* is still applicable when a party seeks sanctions based on the spoliation of electronically stored evidence. As discussed below, we need not make that determination here because, under either Rule 37(e) or the *Flury* test, the district court did not abuse its discretion by denying Plaintiff's motion for sanctions.

## B.    Request for an Adverse Inference

Prior to the amendment of Rule 37, this Court held that an adverse inference instruction is only proper "when the absence of [the] evidence is predicated on bad faith." *S.E.C. v. Goble*, 682 F.3d 934, 947 (11th Cir. 2012) (internal quotation marks omitted). Likewise, an adverse inference instruction is only available under Rule 37(e) if the court finds that the spoliating party "acted with the intent to

28

deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2).

The district court did not abuse its discretion by concluding that Defendant's failure to retain more video did not constitute bad faith or demonstrate an intent to deprive Plaintiff of evidence necessary to her case. Defendant immediately saved the most relevant portion of the video—the hour during which Plaintiff's fall occurred, which covered the entire time Plaintiff was in the store—before any request for preservation or notice of litigation was provided. This initial preservation fulfills the request of Plaintiff's first two preservation letters. As to Plaintiff's subsequent preservation letters, the requests in those letters encompassed all video media from every camera at the store for a period of thirty-five days—totaling 840 hours of video per camera, assuming the cameras run for 24 hours a day. Defendant might reasonably, and in good faith, have concluded that it did not have to comply with such a broad and far-reaching request.

Nor is there any other evidence of bad faith. First, there is no indication that Defendant destroyed the evidence in a manner inconsistent with its normal video-retention policies. Second, this is not the sort of case where the unpreserved evidence clearly would have resolved a crucial issue in the case. *See Flury*, 427 F.3d at 946 (suggesting that, in making the bad faith determination, the court should "weigh the degree of the spoliator's culpability against the prejudice to the

29

opposing party"). Plaintiff hoped the video would contradict the testimony of Defendant's employees that inspections were conducted at 5:00 and 6:00 a.m. on the morning of Plaintiff's accident and that the aisle had been auto-scrubbed the night before the accident, with an employee following the machine to pick up excess liquid. Further, Plaintiff hoped the video would show that an employee's stocking cart traversed the area of the fall, from which the jury might infer that the cart was leaking some sort of liquid, which dripped on the spot of the fall and remained on the floor until Plaintiff came into contact with it. Yet, Plaintiff never narrowed her request to cover just those periods of time. Moreover, Plaintiff provides no reason to believe that the video would have actually shown these things such as conflicting testimony, inconsistent statements, or observations from other witnesses. Failure to preserve such speculative evidence does not raise the specter of bad faith in the same way that a failure to preserve evidence of a specific, crucial event in a case might.

## C.    Request for Exclusion of Evidence

Likewise, the district court did not abuse its discretion by denying Plaintiff's alternative sanctions request, which was to preclude Defendant's witnesses from testifying that the location of Plaintiff's fall had been cleaned or inspected hours prior to the accident. Under either *Flury* or Rule 37(e), such a sanction depends on a finding that destruction of the evidence resulted in prejudice to the opposing

30

party.  In both its initial ruling and its oral ruling upon reconsideration, the district court held that Plaintiff had not been prejudiced by Defendant's failure to provide additional video evidence.  Specifically, the court found that any additional benefit from the undisclosed video was "purely speculation and conjecture," and that the resolution of the videos was not clear enough to see any liquids on the floor, even if the videos were available.  The court thus concluded that "having additional videotape to look at would accomplish nothing but consume more of everybody's time in this case."  There is no basis for finding that the district court abused its discretion in reaching this conclusion.  *See Harris v. Chapman*, 97 F.3d 499, 506 (11th Cir. 1996) ("District judges are accorded wide discretion in ruling upon discovery motions, and appellate review is accordingly deferential.  A judge's decision as to whether a party or lawyer's actions merit imposition of sanctions is heavily dependent on the court's firsthand knowledge, experience, and observation.").

## CONCLUSION

For the above reasons, we affirm the district court's rulings on Plaintiff's motion *in limine*, ML Healthcare's motions to quash, and Plaintiff's motion for spoliation sanctions.  The final judgment of the district court is therefore **AFFIRMED**.