**WHOLE COURT**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS
COURT. ALL FILINGS MUST BE SUBMITTED WITHIN
THE TIMES SET BY OUR COURT RULES.*

**March 16, 2021**

# In the Court of Appeals of Georgia

A20A2074, A20A2075. KENNISON v. MAYFIELD et al.; and vice
versa.

Doyle, Presiding Judge.

Keith Mayfield was killed when his motorcycle collided with Vickie
Kennison's car as she made a left turn. Mayfield's widow and his estate filed this
action alleging that Kennison was negligent and negligent per se for failing to yield
to oncoming traffic. Almost twelve years after the collision, the case was tried before
a jury over the course of seven days. The jury returned a verdict awarding the
plaintiffs damages of $33,438,267.82 and apportioning three percent of fault to
Mayfield and ninety-seven percent of fault to Kennison.[1] The trial court entered
judgment on the verdict for $3,213,869.79 on the estate's claim, $29,221,250 on the

---

[1] After phase two of the trial on attorney fees, the jury declined to award
attorney fees to the plaintiffs pursuant to OCGA § 13-6-11.

wrongful death claim, and prejudgment interest and court costs. After a subsequent

hearing, the trial court also awarded the plaintiffs $12,751,258.60 in attorney fees and

$91,018.36 in expenses under OCGA § 9-11-68, the offer of settlement statute.[2]

Kennison appeals in Case No. A20A2074, arguing that the trial court erred by

allowing the plaintiffs to question her about her prior traffic citations, driver's license

suspension, and DUI arrest. She also argues that the trial court erred in calculating the

amount of attorney fees. The plaintiffs cross-appeal in Case No. A20A2075,

challenging the apportionment of fault to Mayfield and the admission of certain

evidence and a jury charge relating to Mayfield's speed. For the reasons that follow,

in Case No. A20A2074, we affirm the verdict, but vacate and remand the trial court's

order awarding OCGA § 9-11-68 attorney fees. We affirm in Case No. A20A2075.

*Relevant Facts and Procedural History*

Prior to trial, Kennison moved in limine to exclude any reference to her driving

record,[3] and the trial court granted the motion, noting that the parties consented in

---

[2] The trial court denied the plaintiffs' request for attorney fees pursuant to OCGA § 9-15-14.

[3] The relevant portion of this motion in limine states:

Defendant moves that during the trial of this case[,] Plaintiff, Plaintiff[s'] counsel[,] and Plaintiff[s'] witnesses be precluded from

2

open court to that portion of the motion in limine. The court also granted another of Kennison's motions in limine seeking to bar evidence that she had been involved in any traffic collisions or charged with traffic offenses before or after the collision at issue or that she had a history of careless driving.[4] In its order, the trial court ruled:

> making any statements, propounding any questions, or uttering any testimony in the presence of the jury that reveals or suggests the existence of any evidence relating to the Defendant'[s] prior or subsequent traffic citations and/or driving record. Such evidence is completely irrelevant to the issues of negligence in this case. The only purpose of such evidence would be to prejudice the jury. Accordingly, any evidence concerning the Defendant's prior and/or subsequent driving record should be properly excluded. *Leo v. Williams*, 207 Ga. App. 321 [(428 SE2d 108)] (1993).

[4] The relevant portion of this motion in limine states:

Defendant moves that during the trial of this case Plaintiff, Plaintiff's counsel[,] and Plaintiff's witnesses be precluded from making any statements, propounding any questions[,] or uttering any testimony in the presence of the jury that suggests that [Defendant had] been involved in any traffic collisions prior or subsequent to the collision at issue in this case or that [Defendant had] been charged with traffic offenses prior or subsequent to the collision at issue in this case, or that [Defendant had] a history of careless driving. "Evidence of other crimes, wrongs, or actions shall not be admissible to prove the character of a person in order to show action in conformity therewith... " OCGA § 24-4-404 (b). Evidence of other acts or omissions create a substantial likelihood of prejudicing a jury against the Defendant as to the question of liability in the particular case. Accordingly, a party's negligence or lack of negligence on the occasion at issue in a complaint can be proved only by the facts of the event and not by evidence of her prior driving record

"After a contested hearing, the Court grants Defendant's [Eighth] Motion in Limine. Neither prior, nor subsequent[] automobile collisions involving the Defendant shall be referenced before the jury." The trial court further specifically directed counsel – in bold type – "**to notify the court immediately if there is a violation of a motion in limine so the court may consider curative options.**"[5]

At trial,[6] the evidence showed that on March 14, 2007, at approximately 10 p.m., Kennison was driving her car north on State Route 3. She entered the intersection with Talmadge Road, intending to turn left. Mayfield was riding his motorcycle south on State Route 3. As Kennison turned left, she collided with

---

or of her general character for carelessness or recklessness in driving. *Garner Victory Express, Inc.*, 214 App. 652 [(448 SE2d 719)] (1994). Based on the foregoing argument and citation of authority, the Defendant hereby moves this Court to order that there be no questions, comments[,] or testimony concerning on any prior or subsequent incidents, traffic violations, complaints, or accidents involving the Defendant. The Defendant further moves the Court to order Plaintiff's counsel to explain this order to Plaintiff and each of Plaintiff's witnesses.

[5] (Emphasis in original.)

[6] On appeal, we view the evidence in the light most favorable to the jury's verdict. See *Almond v. McCranie*, 283 Ga. App. 887, 888 (643 SE2d 535) (2007).

Mayfield's oncoming motorcycle. Kennison did not see Mayfield before the collision, and there was no evidence that either vehicle braked before the collision.

Two witnesses who were in a car driving south on State Route 3 noticed Mayfield while they were stopped at a traffic light in front of a Walmart about a mile before the intersection where the collision occurred. When the light changed to green, the witnesses proceeded forward, gaining speed up to between 55 and 65 miles per hour. Mayfield's motorcycle, which also had been stopped at the light, rapidly accelerated from the light and was traveling much faster than the witnesses. One of the two witnesses estimated that Mayfield was traveling well over 80 to 90 miles per hour, and the other estimated that Mayfield was traveling 95 miles per hour. The witnesses watched the motorcycle "continue getting smaller, like down the strip," until it almost disappeared; to them, he never appeared to slow down. The witnesses also saw the headlights of Kennison's car before the wreck. Another witness who had been stopped at the light in front of the Walmart testified that after the light turned green, the motorcycle pulled away from him and began traveling at 85 to 95 miles per hour. The motorcycle never left his sight, and it never appeared to slow down. Before Kennison completed her turn, Mayfield collided with the rear passenger portion of her four door car. There was evidence that Mayfield could have seen the headlights

5

of Kennison's car and perceived the threat the car posed. Mayfield died as a result of the injuries he sustained in the collision.

At the conclusion of the trial, the trial court entered judgment on the jury verdict in favor of the plaintiffs and granted attorney fees to the plaintiffs pursuant to OCGA § 9-11-68. These appeals followed.

*Case No. A21A0274*

On appeal, Kennison asks this Court to reverse the jury verdict and remand for a new trial based on erroneous evidentiary rulings. She also asks this Court to reverse the trial court's order awarding the plaintiffs attorney fees pursuant to OCGA § 9-11-68. We discern no basis for granting a new trial, but we vacate and remand the attorney fee order.

1. *Kennison's challenges to evidentiary rulings*. Kennison argues that the trial court erred by allowing plaintiffs' counsel to introduce evidence of her traffic citations, including a citation for speeding on State Route 3, the suspension of her driver's license, and her arrest for driving under the influence of alcohol because it violated the motions in limine, was irrelevant and prejudicial, and could not otherwise be used for impeachment purposes. Based on the record before us, Kennison has failed to demonstrate reversible error.

6

To address the several related issues before us, we set out the relevant testimony, objections, failures to object, and colloquies chronologically. The plaintiffs called Kennison as their first witness for purposes of cross-examination. Plaintiffs' counsel questioned Kennison about traffic on State Route 3 — the average speed and her own speed in particular.

> PLAINTIFFS' COUNSEL: At that time, you were aware that the average speed on State Route 3 — that a lot of people might travel in excess of the posted speed limit, correct?
> KENNISON: Correct.
> PLAINTIFFS' COUNSEL: And wouldn't you agree that you, yourself, have traveled over the speed limit on SR 3?
> KENNISON: Umm — probably.
> PLAINTIFFS' COUNSEL: And isn't it true that before you'd told us that you had never traveled over the speed — speed limit on Tara Boulevard?
> KENNISON: I might have told you that.
> PLAINTIFFS' COUNSEL: Okay. And so . . . but the accurate information is, in fact, that you —
> KENNISON: I normally drive —
> PLAINTIFFS' COUNSEL: — you have — you have exceeded the speed limit — either you have or you haven't — might have. That sounds like something that you could — you could probably tell us one way or another. Have you personally —
> KENNISON: I might have went —
> PLAINTIFFS' COUNSEL: — exceeded the speed limit —
> KENNISON: — 58 over the 55 speed limit.
> PLAINTIFFS' COUNSEL: Okay. So you — you contend the fastest you might have ever traveled on S — State Route 3 would be 58 —

Defense counsel objected at this point on the grounds of "improper character evidence" and that the evidence of Kennison speeding years before was not relevant because there was no contention that she was speeding at the time of the collision with Mayfield. Plaintiffs' counsel responded that the evidence was relevant to Kennison's ability to understand the speeds of vehicles on the roadway where the collision occurred. The trial court overruled the objection.

Plaintiffs' counsel continued as follows:

PLAINTIFFS' COUNSEL: So — just so we confirm, it's your contention that the fastest you've ever driven on State Route 3 would be 58 in a 55?
KENNISON: Correct.
PLAINTIFFS' COUNSEL: Okay. And you're sure you wouldn't have exceeded more than 58 in a 55 on Tara Boulevard, correct?
KENNISON: That's correct.

Plaintiffs' counsel then asked for a bench conference in order to inform the court that he wanted to introduce a certified copy of Kennison's 3-year-old conviction for driving 74 miles per hour on State Route 3, which has a speed limit of 55 miles per hour. Defense counsel responded that plaintiffs' counsel could not use extrinsic evidence to impeach a witness on a collateral, irrelevant matter. He also argued that the conviction amounted to improper character evidence that suggested Kennison was

8

a dangerous driver. The trial court allowed plaintiffs' counsel to introduce the certified copy of the conviction.[7]

After it was admitted, Kennison admitted having traveled up to 74 miles per hour on Route 3.

> PLAINTIFFS' COUNSEL: Okay. And just to confirm, you did actually get cited and pled guilty to traveling 74 miles an hour on — in a 55 mile an hour zone on Georgia 3, —
> KENNISON: That is correct.
> PLAINTIFFS' COUNSEL: — correct? Okay. Does that — does that help refresh your memory about how fast you might have traveled on Georgia 3?
> KENNISON: Yes.
> PLAINTIFFS' COUNSEL: Okay. So rather than just 58, you might have had times where you traveled up to 74 miles an hour on Georgia 3, correct?
> KENNISON: That's correct.

The cross-examination then turned to arrests. Plaintiffs' counsel asked Kennison whether she had been arrested for that citation, and she responded that she had not. He then asked her whether she had ever been arrested, and she answered no. Defense counsel did not object to either question.

Plaintiffs' counsel then asked to approach the bench, but Kennison continued to speak. The court instructed her to wait, and then, after the bench conference (at

---

[7] Pretermitting whether the certified copy of the citation was properly admitted, Kennison does not challenge the admission on appeal.

which plaintiffs' counsel stated that he wanted to preserve the record to show that Kennison seemed to be changing her answer once he asked to approach her) told her that she could continue her answer. Kennison testified, "Umm — again, I'm bad with dates, and I do remember I was arrested at one point for reckless driving, but I don't remember the dates."

The cross-examination then turned to her other traffic violations and the suspension of her license.

> PLAINTIFFS' COUNSEL: Okay. And when you had talked to us in your deposition, you had actually — instead of mentioning that, you had just stated that you had only had three speeding tickets in thirty years, right?
> KENNISON: I'm assuming that's what I said, yes. I don't recall.
> PLAINTIFFS' COUNSEL: And you, in fact, stated that your — your license had never been suspended, right?
> KENNISON: They have not ever been suspended, I don't — as far as I remember, no —
> PLAINTIFFS' COUNSEL: Okay.
> KENNISON: — my not — license has never been suspended.

Defense counsel did not object to these questions.

Plaintiffs' counsel asked for another bench conference. He informed the court that he had certified records showing that, contrary to Kennison's testimony, her driver's license had been suspended, and she had received citations for nine traffic violations.

10

Defense counsel responded that Kennison's prior driving history was improper character evidence; that plaintiffs' counsel could not use extrinsic evidence to impeach Kennison; that plaintiffs' counsel was bound by Kennison's answer; that the evidence was highly prejudicial; and that the evidence was inadmissible under OCGA § 24-6-613, which concerns prior statements of witnesses. Defense counsel added, "when you're attempting to impeach someone by a prior conviction or other matter — it's probably something that should have been addressed pretrial, and there are some other inquiries the court's [going to] have to make as to whether that would be proper." He then argued that plaintiffs' counsel was improperly trying to bring in irrelevant, prejudicial, improper, character evidence that otherwise would not be admissible under the guise of impeachment. Defense counsel added, "What they cannot do is put these documents into evidence for that effect. *They can ask the question*, they're bound by the answer, they can't come in and introduce evidence to the contrary."[8]

Plaintiffs' counsel agreed that the documents were not relevant to the issues on trial and were not admissible under certain other theories. But he argued that they were admissible to impeach Kennison. The trial court ruled that plaintiffs' counsel

---

[8] (Emphasis supplied.)

could ask the questions, and if Kennison "[gave] answers otherwise," he could use the documents to refresh her memory; if, on the other hand, she maintained her incorrect answers, the court "very likely" would allow plaintiffs' counsel to introduce the documents for purposes of impeachment.

The following then occurred:

PLAINTIFFS' COUNSEL: And, Ms. Kennison, I just want to make sure we got information correct and I gave you an opportunity to give some corrections, if necessary. Would you — would you agree that your license actually had been suspended for — for a points violation in the past?
KENNISON: Yes.

Defense counsel then requested, and was granted, "a standing objection to this line of questioning." Plaintiffs' counsel then continued.

PLAINTIFFS' COUNSEL: Okay. Would you also agree that you were convicted of a Failure to Obey Signs or Control Devices?
KENNISON: (No audible response.)
PLAINTIFFS' COUNSEL: I can show this to you, if you'd like.
KENNISON: Sure.
PLAINTIFFS' COUNSEL: Sure. Okay.
KENNISON: If that's what it says, yes, I agree.

Plaintiffs' counsel showed the documents to Kennison, and she admitted to their content.

PLAINTIFFS' COUNSEL: Okay. Well, is it correct that there are — you'd mentioned that there were three tickets in thirty years and — and

it's actually more accurate to say that there were about eight tickets in thirty — wait — well, eight tickets shown just on your driver's report, correct?
KENNISON: Correct.
PLAINTIFFS' COUNSEL: Okay. And those included things such as convictions for speeding and disobeying stop signals, things like that, right?
KENNISON: Correct.
PLAINTIFFS' COUNSEL: Okay. Then that's fine. I — I will move on from that. And — and then in addition, the — the actual arrest that you had, that was actually an arrest for DUI on State Route 3, correct?
KENNISON: Years ago, yes, that is correct.

Plaintiffs' counsel did not introduce the documents into evidence and moved on to different subjects.

(a) *Violations of motions in limine.* As an initial matter, plaintiffs' counsel's questions on cross-examination regarding Kennison's prior driving record, DUI arrest, and suspension of her driver's license violated the ruling on the pretrial motions in limine. But because Kennison did not make a contemporaneous objection on that basis, the violation doesn't mandate reversal.

It is true that "[o]nce the court makes a definitive ruling on the record admitting or excluding any evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve such claim of error for appeal."[9] If, however,

---

[9] See OCGA § 24-1-103 (a).

13

a party violates that the ruling, the party that moved to exclude the evidence must make a contemporaneous objection to its admission when the evidence is offered in order to preserve the claim of error for appeal because "[t]he error, if any, in such a situation occurs only when the evidence is offered and admitted."[10]

And again, in its order, the trial court expressly directed, writing in bold-faced type, that counsel immediately notify the court of any violations of any in limine rulings. Therefore, absent a contemporaneous objection that plaintiffs' counsel was violating the ruling in limine, the mere granting of Kennison's motions in limine did not preserve error for appellate review.[11] Here, defense counsel did not make a

---

[10] See *ML Healthcare Svcs., LLC v. Publix Super Markets*, 881 F3d 1293, 1305 (II) (E) (11th Cir. 2018) (quoting the advisory committee notes to Fed. R. Evid. 103, which is nearly identical to OCGA § 24-4-103). See also *State v. Orr*, 305 Ga. 729, 740 (827 SE2d 892) (2019) ("Where rules in the new Evidence Code are materially identical to Federal Rules of Evidence, we look to federal appellate law, and in particular the decisions of the United States Supreme Court and the Eleventh Circuit, to interpret them, instead of following our own precedent issued under the old Evidence Code.").

[11] Cf. *Harvey v. Williams*, 354 Ga. App. 766, 769 (1) (a) (841 SE2d 386) (2020) (holding that defendants' failure to contemporaneously object to inflammatory argument prohibited by ruling in limine did not waive error because ruling in limine requiring parties to notify the court of violations pertained to violations concerning testimony and evidence, not argument of counsel). We note that the Supreme Court of Georgia has granted certiorari in *Harvey* and is "particularly concerned with the . . . issue [of] . . . [w]hether a party must object to argument of counsel that allegedly violates a granted motion in limine in order to preserve the issue for appeal[.]"

14

contemporaneous objection when plaintiffs's counsel elicited the testimony on cross-examination. Moreover, defense counsel affirmatively stated that plaintiffs' counsel could ask questions about her arrest, her license suspension, and her driving violations other than that for speeding on State Route 3. Based on this record, the fact that the in limine ruling was violated presents no basis for reversal.

Turning to the specific objections Kennison did make at trial, we find no reversible error.

(b) *Evidence of Kennison's speeding on State Route 3.* Plaintiffs' counsel questioned Kennison about her knowledge of and personal speeding on State Route 3, but defense counsel waited to object on "improper character evidence" grounds until the sixth such question, which was overruled by the trial court. Having failed to contemporaneously object, Kennison waived any error as to the evidence up to that point.

---

*Williams v. Harvey*, 2020 Ga. LEXIS 790 (Case No. S20C1121, decided Oct. 19, 2020). See *Thomas v. Alligood*, ___ Ga. App. ___, ___ (3) (b) (Case No. A20A1950, decided Mar. 4, 2021) (following the holding in *Harvey* while noting that certiorari was pending in the Supreme Court). See also *Larose v. Bank of America, N. A.*, 321 Ga. App. 465, 468 (740 SE2d 882) (2013) ("[W]e are obligated by statute to decide the case under the current law even though the Supreme Court of Georgia may at some point address the issue raised in [the defendant's] . . . enumeration of error.").

When Plaintiff's counsel sought to introduce Kennison's three-year-old conviction for speeding, Defense counsel immediately responded that plaintiffs could not use extrinsic evidence to impeach a witness on a collateral, irrelevant matter, arguing that there was no contention that Kennison was speeding at the time of the collision. The trial court overruled the objection, explaining in the order denying Kennison's motion for new trial that "Kennison's own experience with speed on Route 3 was relevant and admissible because it went to her knowledge of the speeds commonly driven on Route 3 and the speeds of vehicles that could be approaching the intersection when turning across Route 3 at the time of the subject collision."[12] Kennison claims on appeal that the evidence was unfairly prejudicial, but at trial she

[12] Our Evidence Code defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-401. The Code provides that "[a]ll relevant evidence [is] admissible, except as limited by constitutional requirements or as otherwise provided by law or by other rules[.]" OCGA § 24-4-2. And although "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ," OCGA § 24-4-403, "the exclusion of relevant evidence . . . is an extraordinary remedy that should be used only sparingly." *Smith v. State,* 302 Ga 717, 724 (3) (808 SE2d 661) (2017). "Decisions regarding relevance are committed to the sound discretion of the trial court. . . ." *Venturino v. State,* 306 Ga. 391, 395 (2) (b) (830 SE2d 110) (2019).

did not specify Rule 403 or mention unfair prejudice as grounds for her objection.[13] Accordingly, "we consider the question not under the ordinary abuse-of-discretion standard, but as a question of plain error."[14]

To show plain error, Kennison must show an error or defect that she has not "affirmatively waived," that is "clear or obvious," and that "affected [her] substantial rights" by "affect[ing] the outcome of the trial court proceedings"; if these three requirements are satisfied, this Court has the discretion to remedy the error but we should do so only if it "seriously affect(s) the fairness, integrity or public reputation of judicial proceedings."[15]

Considering the issue under the plain-error standard, we cannot conclude that the prejudicial effect of the evidence of Kennison's speeding on State Route 3 so dramatically outweighed its probative value that we must reverse. Kennison's

---

[13] See *Chrysler Group, LLC v. Walden*, 303 Ga. 358, 368-369 (II) (A) (812 SE2d 244) (2018).

[14] Id. at 369 (II) (B) (holding that because a party failed to object to the admission of evidence based on OCGA § 24-4-403, "we can only analyze whether the admission of this evidence [on this ground] constituted plain error, not whether it was an 'ordinary' abuse of discretion").

[15] (Citations and punctuation omitted.) *Gates v. State*, 298 Ga. 324, 327 (781 SE2d 772) (2016). See OCGA § 24-1-103 (d).

17

knowledge that drivers speed on State Route 3 was relevant to the issue of her making her left turn, and her credibility — because she was the only eyewitness to the turn to testify — was central to the questions before the jury.

(c) *Other evidence of Kennison's driving record*. Defense counsel did not object when plaintiffs' counsel questioned Kennison about her arrest for DUI, the suspension of her driver's license, and her traffic citations other than that for speeding on State Route 3. Only when plaintiffs' counsel requested a bench conference at which he informed the court that he had certified records showing that Kennison had not been truthful did defense counsel raise objections touching on these subjects. But he concluded his objection with the statement that, "What they cannot do is put these documents into evidence [to impeach Kennison]. *They can ask the question*, they're bound by the answer, they can't come in and introduce evidence to the contrary."[16]

Plaintiffs' counsel asked the questions and showed Kennison the documents, but did not introduce them into evidence. As the trial court found in the order denying the motion for new trial, "[u]ltimately, the trial proceeded consistent with [d]efendant's suggested procedure: the questions were allowed to be asked, and the records were not placed into evidence, nor published to the jury." Whether the

---

[16] (Emphasis supplied.)

documents would have been admissible is not before us,and Kennison cannot complain on appeal about these questions because she affirmatively agreed that they could be asked.[17]

(d) *Impeachment on cross-examination*. Kennison further argues that the plaintiffs could not impeach her false testimony because she gave it on cross-examination in response to improper questions. But Kennison ultimately agreed that plaintiffs' counsel could ask questions about these matters, but could not impeach her untruthful answers by introducing documentary evidence. The questions were asked, but because Kennison's testimony was consistent with the documents, they were not introduced. Thus, Kennison has not shown reversible error.[18]

Finally, Kennison argues that because her false responses concerned immaterial matters, they were not subject to impeachment, and the impeachment was unduly prejudicial.[19] As detailed above, Kennison agreed that plaintiffs' counsel could ask

---

[17] See *Dyals v. Dyals*, 281 Ga. 894, 896 (3) (644 SE2d 138) (2007) (party cannot complain of error induced by his own conduct); *Central of Ga. R. v. Ross*, 342 Ga. App. 27, 35 (2) (b) (802 SE2d 336) (2017) (same).

[18] See *Dyals*, 281 Ga. at 896 (3); *Central of Ga. R. v. Ross*, 342 Ga. App. at 35 (2) (b).

[19] See *Hand v. South Ga. Urology Center, P. C*., 332 Ga. App. 148, 156-157 (3) (769 SE2d 814) (2015) ("witness may not be impeached based upon a discrepancy

questions about this evidence. Once defense counsel asked the questions, Kennison gave truthful answers, and he did not attempt to impeach her. Therefore, Kennison has not shown reversible error.[20]

2. *Calculating attorney fees under OCGA § 9-11-68 in the contingency fee context.* The trial court awarded $12,751,258.60 in attorney fees under OCGA § 9-11-68, which authorizes an award of attorney fees incurred after the rejection of a good-faith settlement offer under certain circumstances. Kennison challenges that award as unauthorized by law and unsupported by the evidence. We agree.

Here, the injury occurred in 2007, plaintiffs' counsel testified that he was hired in 2008 , the initial complaint was filed in 2009 and renewed in 2014, and the plaintiffs' $1 million settlement offer was made and rejected approximately 7 years later in 2015.[21] Following a jury trial, the $32,878,146.42 judgment against Kennison was entered in 2019. The trial court based its attorney fee award on a 40 percent

---

relating to a wholly immaterial matter"), overruled in part on other grounds by *Phillips v. Harmon*, 297 Ga. 386, 393-399 (II) (774 SE2d 596) (2015).

[20] See *Dyals*, 281 Ga. at 896 (3); *Central of Ga. R. v. Ross*, 342 Ga. App. at 35 (2) (b).

[21] Plaintiffs' counsel tendered the offer of settlement on March 3, 2015. By its terms, it expired on April 2, 2015, and was deemed rejected absent timely acceptance.

contingency fee agreement between the plaintiffs and their attorneys and calculated the award by applying 40 percent to the difference between the plaintiffs' $1 million settlement offer and the $32,878,146.42 judgment (i.e., what plaintiffs' counsel characterized as the "value added" to the case by the work they did after the offer was rejected).

Relevant to these facts, OCGA 9-11-68 (b) (2) provides:

If a plaintiff makes an offer of settlement which is rejected by the defendant and the plaintiff recovers a final judgment in an amount greater than 125 percent of such offer of settlement, the plaintiff shall be entitled to recover reasonable attorney's fees and expenses of litigation incurred by the plaintiff or on the plaintiff's behalf from the date of the rejection of the offer of settlement through the entry of judgment.[22]

---

[22] "Generally, an award of attorney fees is not available in Georgia unless authorized by statute or contract." *Ware v. American Recovery Solution Svcs.*, 324 Ga. App. 187, 193 (3) (749 SE2d 775) (2013). OCGA § 9-11-68 is such a statute, the purpose of which "is to encourage litigants in tort cases to make and accept good faith settlement proposals in order to avoid unnecessary litigation." *Smith v. Baptiste*, 287 Ga. 23, 29 (2) (694 SE2d 83) (2010). "Once a prevailing party demonstrates that OCGA § 9-11-68 applies, the trial court '*shall* order the payment of attorney[] fees and expenses of litigation.' Such an award may be disallowed *only* where the trial court finds the settlement offer was not made in good faith." (emphasis supplied; citation and punctuation omitted.) *Anglin v. Smith*, __ Ga. App. __ (853 SE2d 142) (2020), citing OCGA § 9-11-68 (d) (2). An award under OCGA § 9-11-68 (b) is not dependent on any explicit finding of bad faith on the part of the party rejecting the

In determining what fee is reasonable in the context of a contingency fee agreement, the Supreme Court of Georgia, in *Ga. Dept. of Corrections v. Couch*,[23] explained:

> A court may consider a contingent fee agreement and the amount it would have generated as evidence of usual and customary fees in determining both the reasonableness and the amount of an award of attorney fees. When a party seeks fees based on a contingent fee agreement, however, the party must show that the contingency fee percentage was a *usual or customary fee* for such case *and that the contingency fee was a valid indicator of the value of the professional services rendered*. In addition, the party seeking fees must also

offer.

The plaintiffs asserted that the award in this case was a "sanction against the [d]efendant for unreasonably refusing to settle. . . . [Y]ou need to make a real sanction against the insurance companies to control that behavior." And our Supreme Court has stated that the "payments of attorney[] fees and litigation expenses under OCGA § 9-11-68 (b) are not made as compensation for a tort 'claim,' they are made as an incident of a party's inappropriate conduct in the underlying tort action. *Ga. Dept. of Corrections v. Couch*, 295 Ga. 469, 476 (2) (b) (759 SE2d 804) (2014). But the statute itself contains no requirement that the rejecting party have acted inappropriately before the trial court can award fees. To the contrary, once the offer is shown to have been made in good faith, the trial court has no choice but to award fees even if the party rejecting the offer had valid reasons for doing so. And here, it is not obvious that Kennison exhibited poor judgment in taking the case to trial in light of the evidence of Mayfield's excessive speed and risky operation of his motorcycle after dark.

[23] 295 Ga. 469 (759 SE2d 804) (2014).

introduce evidence of hours, rates, or some other indication of the value of the professional services actually rendered. Accordingly, *evidence of the existence of a contingent fee contract, without more, is not sufficient to support the award of attorney fees. An attorney cannot recover for professional services without proof of the value of those services*. A naked assertion that the fees are "reasonable," without any evidence of hours, rates, or other indication of the value of the professional services actually rendered is inadequate.[24]

Thus, it is the *value* of the professional services *actually performed* during the pertinent time frame that guides the analysis, and the *Couch* decision makes it clear that a contingency fee agreement can inform this analysis to the extent that it is "*a valid indicator of the value of the professional services rendered*."[25]

(a) *Relevant time frame*. As a threshold matter, despite reciting the appropriate standard and time frame and listing evidence relevant to that time frame, the trial court ultimately premised its award based on legal work done on behalf of the plaintiffs prior to the date of the rejection of the settlement offer. As noted in the

---

[24] (Punctuation omitted; emphasis supplied.) Id. at 483-484 (3) (a), quoting *Brock Built, LLC v. Blake*, 316 Ga. App. 710, 714-715 (730 SE2d 180) (2012), and *Brandenburg v. All-Fleet Refinishing, Inc.*, 252 Ga. App. 40, 43 (555 SE2d 508) (2001).

[25] (Punctuation omitted; emphasis supplied). *Couch*, 295 Ga. at 484 (3) (a).

order, approximately seven years passed, including discovery and the dismissal and refiling of the complaint, prior to the 2015 settlement offer and rejection. Nevertheless, the trial court justified its determination in part by noting that "[p]laintiffs' attorneys have thus far worked for eleven years and have yet to receive any compensation." This eleven-year period included the seven years leading up to the settlement offer. Thus, based in part on the role of the contingency fee agreement in funding the seven years of litigation leading up to the 2015 settlement offer, the trial court concluded that the contingency fee agreement in this case was reasonable.

*Couch* explicitly rejected this approach:

Couch's [incorrect] approach . . . gives no import to the time limitation set forth in OCGA § 9-11-68 (b) and, contrary to the law . . . places determinative weight on the existence of a contingency fee agreement in the calculation of the reasonable attorney fees due under the offer-of-settlement statute. Under [this erroneous] view, where a contingency fee contract entitled an attorney to payment from his client at the time the judgment was entered (rather than some time thereafter), then based entirely on the existence of that contract between the plaintiff and his lawyer, a defendant would be required to pay for 100 [percent] of the services provided by the lawyer on the matter, even if the lawyer worked intensively for many years on the case before a settlement offer

24

was made . . . and even though the reasonable value of the lawyer's services could not be determined based on the contingency contract.[26]

Thus, to the extent the trial court compensated the plaintiffs' attorneys for their work over the entire eleven-year life of the case, it was not consistent with the fee-shifting language in OCGA § 9-11-68 (b), nor with the purpose of the statute.

(b) *"Value-added" method.* The trial court also erred by adopting the plaintiffs' approach to separating out the value of the work done after the settlement offer. In their motion for attorney fees under OCGA § 9-11-68 (b), the plaintiffs argued that their $1 million settlement offer should be set off against the final judgment amount, and this would reveal the value they added to the case by the work performed after the settlement offer was rejected through the date of the judgment. But this ignores the statutory requirement that there must be some basis for valuing the actual work done after the offer is rejected, i.e. the work performed in this case by plaintiffs' counsel between April 2, 2015 and March 11, 2019. As explained in *Couch*, "[t]he issue in this case is not when and to what extent [the plaintiffs'] attorneys were entitled to recover for their services from [the plaintiffs] according to their contract, but rather when and to what extent they performed services so that fees were incurred

---

[26] Id. at 486 (3) (b).

on [the plaintiffs'] behalf so that [they] could recover from [the defendant] according to OCGA § 9-11-68 (b)."[27]

The amount of the $1 million settlement offer has (or should have) no direct relationship to the amount of work done up to that point; it should represent a measure of the expected damages award based on the plaintiff's injuries and the facts of the case. One may reasonably seek a $1 million settlement based on a relatively small amount of work, or one may reasonably agree to a low settlement despite enormous work if the facts of the case and proceedings lead to that conclusion. Nothing in the "value added" method reveals a reasonable indication of the professional services actually rendered after the rejection of a settlement offer, as *Couch* requires.[28] Therefore, the plaintiffs' proffered value-added method adopted by the trial court was not a valid method for determining the fee award here.

(c) *Reasonableness of attorney fee award*. Turning to the reasonableness of the amount awarded under OCGA § 9-11-68 (b), any such determination must include an analysis of the value of the actual services rendered after the offer to settle is

---

[27] Id. at 485 (3) (b).

[28] See id. at 484 (3) (a).

rejected according to some other evidence of their value.[29] In this case, the trial court relied in part on testimony from the plaintiffs' lead attorney that his usual and customary hourly rate in a case like this one would be $1,900. The trial court accepted this number as reasonable in part because it accounted for the risk that plaintiffs' attorneys undertake when performing legal work on a contingency basis. But this rationale is circular: a $1,900 hourly rate based on a contingency risk is not an hourly rate, it is a contingency fee. It is axiomatic that an hourly rate is billed and payable regardless of outcome. As such, the $1,900 hourly rate *as justified by the risk of nonpayment* cannot serve as "a valid indicator of the value of the professional services rendered," as *Couch* requires.[30]

> A contingency fee agreement is a contract between the lawyer and the client regarding what the client agrees to pay, and what the lawyer agrees to be paid, for the work that the lawyer will do in the matter. Entering such a contract is a gamble for both the lawyer and the client, because *the value of the professional services actually rendered by the lawyer may be considerably higher or lower than the agreed-upon amount*, depending on how the litigation proceeds. While certainly a guidepost to the reasonable value of the services the lawyer performed,

---

[29] See id. at 485-486 (3) (b).

[30] (Punctuation omitted.) Id. at 483 (3) (a).

the contingency fee agreement is not conclusive, and it cannot bind the court in determining that reasonable value, nor should it bind the opposing party required to pay the attorney fees, who had no role in negotiating the agreement.[31]

Thus, a contingency fee agreement is not necessarily a reflection of the "value of professional services actually rendered."[32] There is a distinction between the risk/reward bargain made between the client and his or her attorney and the actual value of the professional services rendered by the attorney. It is recovery of the reasonable value of those services, not the contingency fee agreement itself, that is authorized by OCGA § 9-11-68 (b).[33]

Furthermore, the record does not support a blanket acceptance of the $1,900 hourly rate proffered by the plaintiffs, which number was essentially a way to arrive

---

[31] (Emphasis supplied.) Id. at 484 (3) (a). See also *Khalia, Inc. v. Rosebud*, 353 Ga. App. 350, 359 (836 SE2d 840) (2019) (physical precedent only) ("a trial court's analysis of the amount of attorney fees to be awarded to a plaintiff under OCGA § 9-11-68 (b) (2) should address the reasonableness of the agreed-upon [contingency] fee"), McFadden, C. J., dissenting.

[32] *Couch*, at 295 Ga. at 484 (3) (a).

[33] Nothing in OCGA § 9-11-68 (b) eliminates a client's obligation to pay his attorney the agreed upon contingency fee, assuming it is otherwise an enforceable fee agreement. Our analysis is limited to the authority of a party to force the opposing party to pay "reasonable attorney's fees and expenses incurred," under this Code section.

28

at a total hourly fee comparable to the contingency fee. The plaintiffs' own counsel testified, during the bifurcated trial on the plaintiffs' attorney fee claim under OCGA § 13-6-11, that the average hourly rate charged by attorneys in the area would be much less. And at the OCGA § 9-11-68 hearing, Kennison's expert testified that $1,900 was not "a reasonable hourly rate in Atlanta or Georgia, or, frankly, any place I'm familiar with."[34] Plaintiffs' counsel also argued during his direct testimony that $1,900 was not an accurate value as he generates more than $7,000 per hour when evaluating hours that are traditionally billable to the revenue received by his firm in a year. But even assuming a $1,900 hourly rate was reasonable for lead counsel's services, there was no evidence presented of the level of experience, the specific work performed, or the normal hourly rates for the staff and subordinate attorneys who, according to the plaintiffs' attorney, worked half of the hours on the case. Thus, to the extent the award included time for staff and other attorneys, there was no evidentiary support for doing so.

---

[34] The plaintiffs' witnesses focused on the reasonableness of the 40 percent contingency fee agreement, though one testified she would send her mother to lead counsel and would not think twice about paying $1,900 per hour.

Further, the evidence of time worked was essentially guesswork because plaintiffs' counsel testified that such evidence was unnecessary, and his firm did not keep such records.[35] Rather than attempting to value the services actually rendered, the plaintiffs merely pointed to the fact that they possessed more than 20,000 digital files for the case. Without more,[36] simply possessing a large volume of files and paperwork says nothing about the time spent prosecuting the case after a settlement offer.[37]

---

[35] In two affidavits filed in support of the motion, plaintiffs' counsel averred nothing more than his belief that the total time invested would be in the thousands of hours. At the hearing, plaintiffs' counsel testified that the case took no less than 4,000 and up to 6,000 hours over the entire case and the other 10 attorneys worked collectively the same amount of hours as he did. He also estimated that 80 percent of the work and 98 percent of the value added to the case took place after the March 3, 2015 offer.

[36] Plaintiffs' counsel did offer to discuss each of the more than 20,000 items listed in the files, but at the trial court's direction, it was decided that if the court needed the additional testimony, it would reconvene.

[37] The plaintiffs' reliance on *Home Depot U.S.A. v. Tvrdeich*, 268 Ga. App. 579, 584-585 (2) (602 SE2d 297) (2004), is misplaced. First, that case predates *Couch* and does not address the issues raised by *Couch* in its holding and analysis. Second, *Tvrdeich* merely held that the record, when construed in favor of the jury's verdict, provided some evidence that the contingency fee in that case (40 percent of a $1.5 million personal injury verdict) "was a valid indicator of the verdict on" the plaintiffs' fee claim under OCGA § 13-6-11. Even though the evidence as to value was generalized in *Tvrdeich*, the jury in that case was authorized to weigh the contingency fee and make the award as a proportionately reasonable amount. We do not have such

The better practice in contingency fee cases is, when anticipating an award under OCGA § 9-11-68 (b), to provide some estimate of the value of legal services actually rendered, as *Couch* states: "[T]he party seeking fees must also introduce evidence of hours, rates, or some other indication of the value of the professional services actually rendered."[38] This does not amount to a requirement, nor do we impose one, that contingency fee matters must be contemporaneously tracked in a manner similar to the assiduous tenth-of-an-hour record keeping commonly done in matters billed by the hour. But even without such an undertaking, it is feasible without contemporaneous timekeeping to look at the preparation, discovery, motions practice, and hearings that occurred after the settlement offer and determine a reasonable value of the services rendered over the course of those events based on hourly rates generally accepted in comparable cases.

Based on OCGA § 9-11-68 and evidence in the record, the trial court's attorney fee award of $12,751,258.57 (calculated without respect to the time limitations set forth in OCGA § 9-11-68 and under a value-added theory as 40 percent of the difference between the $1 million offer to settle and the $32,878,146.42 verdict) was

a record here.

[38] *Couch*, at 295 Ga. at 483 (3) (a).

31

not authorized. Accordingly, the fee award is vacated for recalculation consistent with this opinion under the standard set forth in *Couch*.

*Case No. A20A2075*

3. In their cross-appeal, the plaintiffs allege four enumerations of error.

(a) *Challenges to the admission of evidence and charging the jury on negligence per se.* In two enumerations, the plaintiffs challenge the admission of evidence (one regarding Mayfield's speed and another regarding hearsay evidence in medical records). The plaintiffs specifically condition these two enumerations upon the grant of a new trial in the plaintiffs' appeal in Case No. A20A2074. And a third enumeration challenging the trial court's charge to the jury on negligence per se related to Mayfield's speed is similarly conditioned upon a retrial. Having affirmed the verdict in Division 1, we need not address these enumerations.

(b) *Apportionment of fault to Mayfield.* In their fourth enumeration, the plaintiffs argue that the evidence was insufficient as a matter of law to support apportioning fault to Mayfield. We disagree.

OCGA § 51-12-33 (a) required the jury to "determine the percentage of fault of the plaintiff. . . ." And "the question as to the sufficiency of the circumstantial evidence, and its consistency or inconsistency with alternative hypotheses, is a

question for the jury."[39] We must affirm the jury's verdict on the issue of Mayfield's fault "if there is any evidence to support it as the jurors are the sole and exclusive judges of the weight and credit given the evidence."[40]

The plaintiffs' argument is premised on the assertions that the only negligence that the jury could have attributed to Mayfield was his speeding and that there was no admissible evidence of his speeding. We assume that erroneously admitted evidence is excluded from a sufficiency analysis in civil cases.[41] Regardless, there is no error.

Additionally,

[e]ven an operator of a vehicle having the right of way has a duty to maintain a proper lookout, to remain alert in observing approaching vehicles, and to exercise ordinary care in the control, speed and movements of his or her vehicle to avoid a collision if by ordinary

---

[39] *Southern R. Co. v. Ga. Kraft Co.*, 258 Ga. 232 (367 SE2d 539) (1988).

[40] *Golden Isles Cruise Lines v. Lowie*, 350 Ga. App. 1, 1-2 (827 SE2d 703) (2019).

[41] But see *Thomas v. State*, 308 Ga. 26, 28 (838 SE2d 801) (2020) ("[A] sufficiency review under *Jackson* [*v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979)] considers all evidence, whether admissible or not.").

33

diligence he or she could have seen that one was threatened or imminent.[42]

The plaintiffs' expert witness testified that although Mayfield could have seen the headlights of Kennison's car and perceived the threat the car posed, there was no evidence of either vehicle braking. And two of the witnesses who had stopped with Mayfield at the traffic light in front of Walmart saw the lights of Kennison's car before the wreck. "Whether [Mayfield] was negligent in failing to observe that [Kennison] was turning in front of him and to control the speed and movements of his [motorcycle] to avoid the collision [was] a question for the jury."[43] Likewise, given the evidence, it was for the jury to decide whether Mayfield's driving was a contributing factor in causing the wreck.[44] Because Kennison presented some evidence that supported the jury's verdict, we must affirm.

---

[42] *Hite v. Anderson*, 284 Ga. App. 156, 158 (643 SE2d 550) (2007).

[43] *Hite*, 284 Ga. App. at 159.

[44] See *Hall v. Massally*, 329 Ga. App. 136, 139 (1) (764 SE2d 161) (2014) (plaintiffs' testimony, including that plaintiff driver did not see defendant when he looked back before merging and that defendant was speeding, created a jury question as to whether defendant caused the wreck by speeding).

*Judgment affirmed in part and vacated in part, and case remanded in Case No.*

*A20A2074 (Divisions 1 and 2). Judgment affirmed in Case No. A20A2075 (Division*

*3). Rickman, P. J., and Colvin, J., concur. Mercier, J., Brown, J., and Pipkin, J.,*

*concur in Divisions 1 and 3 and in the judgment only as to Division 2. Dillard, P. J.,*

*concurs in Divisions 1, 2 (b) and (c), and 3, and in the judgment only as to Division*

*2 (a). Hodges, J., concurs in Divisions 1 (c) and (d), 2, and 3; in the judgment only*

*as to Division 1 (a) and (b); and specially. McFadden, C. J., Barnes, P. J., Miller, P.*

*J., Reese, P. J., and Senior Appellate Judge Herbert E. Phipps concur in Divisions*

*1 and 3 and dissent to Division 2. Markle, J., concurs in Divisions 1 and 3, and in the*

*judgment only as to the dissent to Division 2.*

A20A2074, A20A2075. KENNISON v. MAYFIELD et al.; and vice

versa.

HODGES, Judge, concurring specially.

I fully concur with the majority, except as to Divisions 1 (a) and (b), to which

I concur in judgment only. More specifically, I concur with the result as to the

challenges to the verdict and damages award, but I write this special concurrence

separately to emphasize serious concerns about the evidentiary procedure that ensued

at trial following defendant Kennison's successful motion in limine, to which

plaintiffs consented.

I am constrained to agree that based on Kennison's acquiescence to the improper cross-examination about her prior driving record, DUI arrest, and suspension of her driver's license, Kennison has failed to demonstrate reversible error in the admission of such evidence. Nevertheless, I disapprove of the practice of using extrinsic evidence to impeach a witness on a collateral, irrelevant matter in direct violation of a trial court order. Plaintiffs argue this is proper impeachment of a witness. It is not. *State v. Rocco*, 259 Ga. 463, 466 (1) (384 SE2d 183) (1989) ("A party may not question a witness concerning inadmissible matter and then elicit testimony thereafter to be impeached with evidence inadmissible in the case-in-chief."). Moreover, plaintiffs' trial counsel's continual disregard of the trial court's ruling on a motion in limine is to be strongly discouraged.

Prior to trial, Kennison moved in limine to prohibit any evidence or examination regarding her driving record or suggesting that she had been charged with traffic offenses or had a history of careless driving. She argued that such evidence was irrelevant and unduly prejudicial. The trial court granted both motions. Notwithstanding this ruling, plaintiffs' counsel called Kennison for cross-examination as his first witness and asked her if she had ever exceeded the speed limit on State Route 3, a question that clearly violated the trial court's ruling in

2

limine; defense counsel did not object to the question. When Kennison replied that she had not, plaintiffs' counsel sought to impeach her with evidence of a speeding citation. Kennison objected on the basis that the conviction was irrelevant and improper character evidence and that the plaintiffs could not use extrinsic evidence to impeach her on a collateral, irrelevant matter; the trial court overruled the objection, the speeding citation was admitted, and Kennison admitted to previously speeding on that road. Plaintiffs' counsel then proceeded to ask Kennison whether she had ever been arrested for DUI or whether her license had been suspended for convictions of failing to obey traffic signs or signals and of speeding. Defense counsel did not object to those questions, but did object when plaintiffs' counsel attempted to impeach Kennison with evidence of her driving record and arrests. Ultimately, however, defense counsel agreed that plaintiffs' counsel could "ask the questions[s]," and because she admitted to the infractions and arrests, the records were not admitted.

While I agree that the trial court did not commit reversible error in finding Kennison's prior speeding on the same road to be admissible under the circumstances described above, I do not agree with plaintiffs that it was appropriate to question Kennison about this topic after consenting to the exclusion of the evidence. The

3

brazen disregard of the trial court's ruling on the motion in limine is even more egregious in the context of the questions concerning Kennison's prior arrests and license suspension. Indeed, plaintiffs' counsel even specifically admitted this evidence was not relevant to the case.[1] It is not proper for counsel to consent to a motion in limine to exclude evidence, and then nonetheless ask questions to elicit the collateral and irrelevant evidence under the guise of impeachment. See *Kritlow v. State*, 339 Ga. App. 353, 356 (3) (793 SE2d 560) (2016) ("A witness may not be impeached based on a wholly immaterial matter . . ."). The bar should be cautioned that conduct such as this could lead to a mistrial in the trial court or reversal on appeal if there is not an acquiescence to the questioning at trial, as was the case here.

I am authorized to state that Presiding Judge Doyle joins in this special concurrence.

---

[1] "I absolutely agree that neither – none of these records would come in on their own, that there would not be any basis for these. These are in particular not at all part of our case in chief. Our case in chief deals strictly with the events that occurred on the date of the collision, regarding her eyesight at the time of the collision, regarding her actions at the time of the collision in failing to yield and failing to act with reasonable care."

4

A20A2074, A20A2075. KENNISON v. MAYFIELD et al.; and vice

versa.

MCFADDEN, Chief Judge, concurring fully in part and dissenting in part.

I concur fully in Division 1 of the majority opinion, which addresses the evidentiary issues in the main appeal. Contrary to what is said in the special concurrence, I do not agree that this is one of the rare occasions where it is appropriate for this court to rebuke counsel—especially as we do not reach the merits. I also fully concur in Division 3, which addresses the cross appeal. But I respectfully dissent from Division 2, which addresses attorney fees.

The trial court carefully followed the applicable law and exercised his broad discretion within the boundaries of that law. He heard extensive evidence about the value of the professional services the plaintiffs' attorneys actually rendered, made findings of fact on the issue, and took care to ensure that the plaintiffs were awarded only fees incurred after the rejection of their settlement offer. We are bound to affirm.

So I respectfully dissent from the majority's reversal of the attorney fee award in Division 2.

Under OCGA § 9-11-68, a party to a tort case who refuses an offer of settlement that is made in good faith and meets other specified criteria, and who later receives a final judgment that is, by 25 percent or more, less favorable than the rejected offer, "shall be" liable for "reasonable attorney's fees and expenses of litigation incurred" after rejection of the offer. OCGA § 9-11-68 (b).

Kennison does not dispute that the statute's criteria have been satisfied, and so that an award of fees and expenses is mandated. Nor does she dispute the amount of expenses. At issue is the amount of fees to be awarded.

As to the amount of fees, the statute provides, under the subsection for plaintiffs' offers, which applies here,

> If a plaintiff makes an offer of settlement which is rejected by the defendant and the plaintiff recovers a final judgment in an amount greater than 125 percent of such offer of settlement, the plaintiff shall be entitled to recover *reasonable* attorney's fees and expenses of litigation *incurred* by the plaintiff or on the plaintiff's behalf *from the date of the rejection* of the offer of settlement through the entry of judgment.

OCGA § 9-11-68 (b) (2) (emphasis added).

2

The statutory language italicized above sets out three requisites as to the amount of fees and expenses to be awarded. OCGA § 9-11-68 (b) (2); see also OCGA § 9-11-68 (b) (1) (corresponding provision for defendants' offers). The fees awarded must be reasonable. They must be incurred by or on behalf of the plaintiff. And they must be incurred after rejection.

As the trial court noted, the "statute provides little guidance on how the amount is determined beyond requiring it to be 'reasonable.'" But our Supreme Court has expanded upon the reasonableness requirement, particularly in the context of contingent fee agreements:

> [a] court may consider a contingent fee agreement and the amount it would have generated as evidence of usual and customary fees in determining both the reasonableness and the amount of an award of attorney fees. When a party seeks fees based on a contingent fee agreement, however, the party must show that the contingency fee percentage *was a usual or customary* fee for such case and that the contingency fee was a *valid indicator of the value* of the professional services rendered. In addition, the party seeking fees must also introduce evidence of *hours, rates, or some other indication of the value* of the professional *services actually rendered*.

*Ga. Dept. of Corrections v. Couch*, 295 Ga. 469, 483 (3) (a) (759 SE2d 804) (2014) (emphasis added), quoting *Brock Built, LLC v. Blake*, 316 Ga. App. 710, 714-715 (2) (b) (730 SE2d 180) (2012).

So under *Couch* a fee award "based on a contingent fee agreement" is reasonable and therefore sustainable if there has been a sufficient showing that the fee agreed to "was a usual or customary fee" and "was a valid indicator of the value of the professional services rendered." 295 Ga. at 483 (3) (a). As to the of the value of the "services actually rendered" that showing must entail "evidence of hours, rates, or some other indication of the value[.]" Id.

In *Couch* the trial court had erroneously awarded the full amount due under the terms of the contingent fee agreement. Our Supreme Court held that this was error in two respects. First, the analysis of reasonableness was inadequate: although evidence of rates and hours had been submitted, the record, the transcript, and "the trial court's order[] reveal[ed] no indication that the court relied on that evidence, rather than exclusively on the contingency fee agreement, in determining the amount of the award." 295 Ga. at 483 (3) (a). Second, the trial court failed to exclude fees and expenses incurred before "the date of the rejection of the offer." 295 Ga. at 485 (3) (b).

4

As the trial court in *Couch* had entirely failed to demonstrate reliance on evidence other than the contingency fee agreement and entirely failed to exclude pre-rejection fees and expenses, the Supreme Court's opinion does not prescribe new tests. It does not tell us how courts must go about weighing the evidence in regard to reasonableness or distinguishing pre-rejection fees and expenses from post-rejection fees and expenses.

Its explication of reasonableness, which is quoted above, restates existing law. It adopts language from a decision of this court, *Brock Built*, 316 Ga. App. at 714-715 (2) (b), which itself quotes language that can be traced back to 1998. *Hsu's Enterprises v. Hospitality Intl.*, 233 Ga. App. 309, 311 (2) (502 SE2d 776) (1998) ("A naked assertion that the fees are 'reasonable,' without any *evidence of hours, rates, or other indication of the value of the professional services actually rendered* is inadequate.") (emphasis added).

Here the plaintiffs advocated a fee award based on the contingent agreement actually entered, calculated by applying the 40 percent contingent fee to the difference between the rejected offer and the judgment. Defendant Kennison advocated an award based on a reasonable hourly rate and number of hours as established by her expert witness's testimony.

5

The trial court conducted a hearing over two days for a total of more than eight hours. Then in a thoughtful, 16-page order, which carefully follows the instructions set out in *Couch*, he entered an award that is based upon the contingent-fee agreement but that uses the evidence of hourly rates and time spent as "[an]other indication of the value of the professional services actually rendered." *Couch*, supra, 295 Ga. at 483 (3) (a).

That order and the hearing transcripts show that there was evidence to support the award, and the trial court carefully considered that evidence. And they show that the trial court carefully complied with the requirements set out in the text of the statute—that a fee award be reasonable, incurred by or on behalf of the plaintiff, and incurred after rejection. And they show that the trial court carefully complied with the requirements set out in *Couch*—that a fee award "based on a contingent fee agreement" must be "a usual or customary fee" and "a valid indicator of the value of the professional services rendered" as shown by "evidence of hours, rates, or some other indication of the value of the attorneys' professional services actually rendered." 295 Ga. at 484 (3) (a). Consequently the trial court avoided the errors reversed in *Couch*: he gave due consideration to "evidence of hours, rates, or other indications [of] value," 295 Ga. at 484 (3) (a), and excluded fees and expenses

6

incurred before "the date of the rejection of the offer." 295 Ga. at 485 (3) (b) (emphasis omitted).

Because the trial court correctly followed the law, and some evidence supports his findings of fact, we must affirm the attorney fee award. See *Haggard v. Bd. of Regents of the Univ. System of Ga.*, 257 Ga. 524, 527 (4) (c) (360 SE2d 566) (1987) (the standard of review for a mandatory attorney fee award "is the 'any evidence' rule"); *Grapefields, Inc. v. Kosby*, 309 Ga. App. 588, 589 (710 SE2d 816) (2011) ("Because OCGA § 14-2-1604 (c) provides in mandatory language that the court 'shall' award attorney fees . . ., the award of attorney fees will be affirmed on appeal if there is any evidence to support it. . . .").

At the outset of his analysis the trial court set out a 25-item list of evidence that "[t]his [c]ourt has considered," which is set out in the margin.[1] That list alone

---

[1] The court wrote that he considered:
1. The estimated number of hours Plaintiffs' counsel worked on the entire case;
2. The estimated number of hours Plaintiffs' counsel worked on the case after the Offer was rejected through the entry of Judgment;
3. The estimated ratio of hours Plaintiffs' counsel spent working on the case after the Offer was rejected [versus] working on the entire case;
4. The significance and importance of the hours Plaintiffs' counsel spent working on the case after the Offer was rejected and how those hours substantially increased the value of the case;
5. In light of the fact that the hours spent on the case were estimates, the Court also considered the substantial expert testimony of multiple witnesses for

7

Plaintiffs that hourly timekeeping among tort plaintiffs' attorneys who are paid pursuant to contingency contracts is not routine, usual, or customary, as well as expert testimony from Defendant's one expert witness who contended that he was aware of some plaintiffs' attorneys who did track hours;

6. The number of hours spent by Defendant's counsel working on the case as well as testimony from one of Plaintiffs' experts who had worked for more than a decade as an insurance defense attorney and for more than a decade as a plaintiffs' attorney and that it was common to spend as much as 10 times the amount of hours developing a plaintiff's case as opposed to defending a case in an insurance defense practice;

7. Plaintiffs' counsel's hourly rate when Plaintiffs' counsel is handling hourly cases;

8. The hourly rate specified in the contingency fee agreement that would have applied if the representation had been terminated before settlement or trial;

9. Expert testimony of Defendant's expert regarding hourly rates;

10. The expert testimony as to the reasonableness of Plaintiffs' counsel's hourly rate as well as observations of hours Plaintiffs' counsel spent working on this case both before and after the Offer was rejected, including witness observations of multiple mock trials conducted by Plaintiffs' counsel;

11. The number of attorneys who worked on the case for Plaintiffs;

12. The expert testimony that cases such as this case alleging claims for personal injury and wrongful death are customarily handled on a contingency fee basis;

13. The expert testimony that a forty percent contingency fee is a usual and customary fee to charge generally to personal injury plaintiffs and specifically for a contested-liability, wrongful-death case that goes to trial;

14. The contingency fee contract that existed between Plaintiffs and their counsel, including the forty percent contingency fee for work performed through the trial;

15. The number of depositions taken, the number of motions filed, and the amount of work required to prepare the case for trial;

16. The total amount of expenses incurred by Plaintiffs in pursuing this case;

17. The expert testimony as to the reasonableness of the hours and expenses;

18. That the only testimony presented to rebut Plaintiffs' expert testimony regarding the reasonableness of fees was an expert witness who had never handled a wrongful-death car-wreck case;

8

precludes a holding that the trial court here repeated the error reversed in Division 3 (a) of *Couch*—where the trial court had been "presented with evidence of the hours worked and rates charged," but the hearing transcript and order "reveal[ed] no indication that the court relied on that evidence, rather than exclusively on the contingency fee agreement[.]" *Couch*, 295 Ga. at 483 (3) (a) (punctuation omitted).

---

19. The evidence that the work of Plaintiffs' counsel after the Offer was rejected through the entry of judgment drastically increased the value of Plaintiffs' case; including that the evidence showed that at the time of the rejection of the Offer, through the eyes of the Defendant, the case was worth $0.00.

20. The evidence that at the time the Offer was rejected, through the eyes of Plaintiffs, the case was worth no more than $1,000,000.00 because that was the amount that Plaintiffs were willing to accept to settle the entire case.

21. Plaintiffs' Affidavits relating to this issue;

22. The fact that, depending on whose eyes you are looking through, the value of this case increased after Defendant rejected the Offer from either $0 or $1,000,000.00 to the Judgment amount of $32,878,146.42, after apportioning fault;

23. The evidence and testimony presented indicating that the increase in value of the case was due to the work of Plaintiffs' counsel after Defendant rejected the Offer;

24. The high degree of difficulty involved in winning Plaintiffs' case in spite of multiple eyewitnesses claiming that Mr. Mayfield's motorcycle was traveling at an excessively high rate of speed well over the speed limit before the collision; and

25. The Court's own personal observations of the seven-day jury trial, plus the multiple pre-trial and post-trial hearing days.

The focus of the trial court's analysis here was whether those fees were reasonable and incurred after rejection. It is undisputed that the fees awarded here were actually incurred by or on behalf of the plaintiffs.

Analyzing reasonableness, the trial court had no difficulty in finding that a 40 percent contingency fee is usual and customary for cases like this one. That too is not in dispute.

Following instruction set out in *Couch*, 295 Ga. at 483 (3) (a), the trial court turned to whether a fee award founded on that 40 percent contingency agreement was "'a valid indicator of the value of the professional services actually rendered'" and "reasonable under the facts and circumstances of this case." Again echoing *Couch* and its recognition that a defendant liable for fees under OCGA § 9-11-68 (b) (2) is not a party to the plaintiff's fee agreement, he noted that contingent fees are a gamble, capable of generating fees disproportionate (either way) to the time and effort expended. Id. But, in an analysis that reflects broad consideration of the evidence presented, he held that, despite the size of the judgment, this is not such a case:

> After consideration of the evidence, testimony, facts of this case, the results obtained for Plaintiffs, and the other factors already described in this Order, this Court does not find this case to be an outlier in which the value of the services rendered was either "considerably higher or

10

lower than the agreed-upon amount." [*Couch*, 295 Ga. at 484 (3) (a).] Instead, the Court finds a 40 percent contingency fee is reasonable considering the large amount of work performed by Plaintiffs' attorneys in successfully taking this contested-liability, wrongful-death case through trial; the skill shown by Plaintiffs' attorneys in presenting this case against equally skillful attorneys for Defendant; the challenges presented relating to both liability and damages, the evidence and testimony presented to this Court relating to hours, rates, and multiple other indications of the value of the professional services actually rendered.

The trial court then turned to determining the amount of reasonable attorney fees incurred following rejection of the offer through the entry of judgment. As part of this analysis he addressed the question whether the award should be "based on [the] contingent fee agreement," *Couch*, 295 Ga. at 483 (3) (a) (citation omitted), as the plaintiffs proposed, or derived from "an 'hours-times-rates' methodology," as Kennison proposed.

Before examining each proposal in turn, the trial court analyzed the evidence. He noted that the plaintiffs had presented "two key pieces of evidence": the fee agreement and an affidavit of lead counsel. The fee agreement provides, as one alternative to the 40 percent contingency, that should counsel be terminated prior to disposition, the fee could be calculated at lead counsel's hourly rate, $950.

11

This $950 rate would have applied to work performed by the other lawyers as well as lead counsel. So contrary to the majority, this provision is some evidence of an hourly rate for the other lawyers working on the case. It is true, as the majority notes, that there was no evidence of the experience levels of those other lawyers . While valid, the majority's point is of limited salience. As detailed below, the trial court only used an hours-times-rates methodology as a cross-check after giving due consideration to "evidence of . . . other indications [of] value," *Couch*, 295 Ga. at 484 (3) (a), to decide whether a 40 percent contingency fee was "'a valid indicator of the value of the professional services actually rendered." Id. at 483 (3) (a).)

The other key piece of evidence is the affidavit of lead counsel in which he averred that, for the very few hourly cases he accepts, his rate is $1,900. The record does not tell us anything else about those cases. The veracity of that testimony has not been challenged. But its reasonableness was. Kennison's expert opined that it was not reasonable. On the other hand, one of the plaintiffs' experts on fees, when asked on cross examination if that rate would be reasonable, replied, "Absolutely, and I wouldn't think twice about it." Kennison's counsel did not follow up.

The trial court found that testimony credible. But contrary to the majority, that finding did not amount to "blanket acceptance" of the $1,900 rate. The trial court

considered that number as one element of his analysis "of the value of the professional services actually rendered." *Couch*, 295 Ga. at 483 (3) (a) (citation omitted). There is no indication that the trial court overlooked the fact that the evidence of a $1,900 rate applied only to lead counsel. The trial court also considered the $950 rate, which Kennison advocated and which all of plaintiffs' attorneys charged as an alternative fee in cases of early termination.

The trial court's decision to credit the evidence of a $1,900 rate was a finding of fact. So we are bound to defer to it. *Haggard*, 257 Ga. at 527 (4) (c); *Taylor v. Taylor*, 288 Ga. App. 334, 338 (2) (654 SE2d 146) (2007) ("Credibility of witnesses and the weight to be given their testimony is a decision-making power that lies solely with the trier of fact.") (citation omitted). And so the majority errs in relying on the defense expert testimony challenging it. Moreover, while skepticism is not unreasonable, there are reports that "a new echelon of big firm lawyers has emerged which bills at more than one thousand dollars per hour." William Domnarski, Swimming in Deep Water: Lawyers, Judges, and Our Troubled Legal Profession, 226 (ABA Publishing 2014); see also Mike Scarcella, Denied a Seal, Nelson Mullins Reveals Rates in Fee Petition in Patent Suit, National Law Journal (March 1, 2021)

https://www.law.com/dailyreportonline/2021/03/01/denied-a-seal-nelson-mullins-reveals-rates-in-fee-petition-in-patent-suit/ (retrieved March 3, 2021).

As for time spent, plaintiffs' lead counsel testified that his firm does not maintain contemporaneous time records in contingent cases. But he estimated that he and his firm had spent, at a minimum, approximately 8,000 hours on the case, approximately 6,400 of those hours after the offer was rejected. The defense expert testified that "approximately 1,000 hours would have been [] reasonable." The trial court credited the testimony of plaintiffs' lead counsel, which he described as "a good faith estimate."

We are bound to defer to that finding of fact as well. *Haggard*, 257 Ga. at 527 (4) (c); *Taylor*, 288 Ga. App. at 338 (2). The majority oversteps our authority in dismissing it as "essentially guesswork."

The trial court then turned to the parties' proposals. The plaintiffs proposed that the fee be calculated by applying the 40 percent contingency to the difference between the rejected offer and the eventual judgment. Kennison proposed that the fee be calculated from her expert's testimony regarding what would have been a reasonable hourly rate ($950) and what would have been a reasonable amount of time spent on the case (1,000) hours.

The trial court expressed two concerns about Kennison's proposal. The first focuses on the question of fair and appropriate compensation. Kennison's method, the trial court held, "hinges on estimating what a similarly skilled attorney would agree to be paid when payment is guaranteed. This ignores the fact that Plaintiffs' attorneys took this case under a contingency agreement, whereas defense attorneys generally receive payment regardless of outcome." He continued, in a passage to which the majority objects, "The instant case is a good example of the risk involved with fee-contingent compensation agreements. Plaintiffs' attorneys have thus far worked for eleven years and have yet to receive any compensation."

The trial court's second concern focuses on policy considerations. He concluded that disregarding a reasonable agreed-upon contingent fee in favor of a lower fee based on an assumed hourly rate would reduce defendants' incentive to accept reasonable settlement offers and allow defendants a "win-win scenario," contrary to the purpose of the statute.

We need not endorse those concerns in order to affirm the trial court's decision. And regardless whether the language of OCGA § 9-11-68 (b) (2) "directs courts' attention to the [contingent fee] the plaintiff and his attorney actually agreed upon and that plaintiff actually owes his attorney," *Khalia, Inc. v. Rosebud*, 353 Ga. App. 350,

15

359 (836 SE2d 840) (2019) (physical precedent only) (McFadden, C. J., dissenting), *Couch* expressly authorizes fee awards "based on a contingent fee agreement"—provided the requisite showings have been made and appropriately considered. *Couch*, 295 Ga. at 483 (3) (a). As the trial court noted, OCGA § 9-11-68 provides little guidance.

The trial court's first concern, fair valuation of plaintiffs' counsel's services, reflects consideration of truths universally acknowledged about commercial and economic realities. It is fundamental to any investment or transaction that an uncertain future payment is less valuable than the same payment in cash. The trial court did not abuse his discretion by taking those realities into consideration.

As for the second concern, our Supreme Court has recognized that the purpose of OCGA § 9-11-68 is "to encourage litigants in tort cases to make and accept good faith settlement proposals in order to avoid unnecessary litigation." *Smith v. Baptiste*, 287 Ga. 23, 29 (2) (694 SE2d 83) (2010). That incentive can be very strong.

As the trial court noted here, contingent fees make legal services available to persons who could not otherwise afford them. So when awards under OCGA § 9-11-68 are calculated on the basis of hourly rates, their incentive will often be much stronger for individual litigants, who face exposure to liability for fees that may

16

approach or exceed their annual income, than for institutional litigants, for which such fees are a normal cost of doing business. OCGA § 9-11-68 does not tell trial courts whether to take that potential imbalance into consideration. So it is a matter for their sound discretion.

Having taken the agreed-upon contingent fee as the starting point of his analysis, the trial court turned to "indication[s] of the value of the professional services actually rendered." *Couch,* 295 Ga. at 483 (3) (a). As a cross-check on the reasonableness of that contingent fee, the trial court compared the testimony regarding rates and hours. Accepting the testimony of plaintiffs' counsel regarding time spent and dividing the fee due under the contingent agreement by that number of hours, the trial court calculated, yields $1,992 per hour. This, he noted, is slightly more than the $1,900 rate lead counsel charges for his few hourly cases. And at least as important to the trial court's analysis was that the hourly rate derived from that contingent fee exceed by only about a factor of two the $950 rate which Kennison advocates here and which plaintiffs' counsel's standard fee agreement provides as an alternative in cases of early termination.

But the trial court's analysis of an award based on the contingent agreement was not limited to evidence of hours and rates. *Couch* directs that "a party [who]

seeks fees based on a contingent fee agreement" must "introduce evidence of hours, rates, or some other indication of the value of the professional services actually rendered." 295 Ga. at 483 (3) (a). As to other indications of value, the plaintiffs proved, and the trial court found, that rejection of the offer was followed by

> four additional years of litigation, thousands of hours of work by Plaintiffs' counsel, numerous motions, multiple mock trials, and a highly contested jury trial that involved numerous complex issues, including some that appeared to be matters of first impression in Georgia. The behind-the-scenes tactics and strategies of both sides created complex evidentiary issues that had to be addressed fluidly by both sides, a feat that could not have been accomplished without extensive preparation. For example, even though the Jury only heard from two expert witnesses, that was because the complex tactics and strategies of both sides resulted in multiple experts being withdrawn, limited, or excluded, which included difficult decisions that appeared to be made during the course of the trial. In other words, this was not a routine case that could have been effectively handled by less skilled or less diligent attorneys.

So in deciding to enter an award based on the agreed-upon contingent fee, the trial court acted within the scope of his discretion. He made a well-supported finding that the contingent fee was "a valid indicator of the value of the professional services rendered" and that "the party seeking fees [had sufficiently] introduce[d] evidence of

hours, rates, or some other indication of the value of the professional services actually rendered." *Couch*, 295 Ga. at 483 (3) (a).

The trial court's next step, after deciding to enter an award based on the agreed-upon contingent fee, was differentiating pre- and post-rejection fees. He did so by subtracting the value of the case, as perceived by the parties at the time of the rejected offer, from the amount of the judgment.

In differentiating on that basis, the trial court again rejected the argument that contemporaneous time records should have been required. He dismissed that argument as "an argument of convenience rather than substance." The economics of the defense of civil cases lend themselves to hourly billing rather than contingent fees, so "[l]aboriously tracking time is therefore necessary in order for civil defense attorneys to assert the value of their services to their clients." And as a consequence of that necessity, when the need to show the value of their services for an OCGA § 9-11-68 claim arises, "civil defendants are generally prepared to do so in a different way than civil plaintiff's attorneys are."

The majority criticizes the trial court opinion with the assertion that "the trial court ultimately premised its award based on legal work done on behalf of the plaintiffs prior to the date of the rejection of the settlement offer." This criticism

overlooks the trial court's step-by-step approach. He first determined that the fee due under the terms of the agreement—to which the plaintiffs and their counsel were parties and the defendant was not a party—had yielded a fee that "was a valid indicator of the value of the professional services rendered." *Couch*, 295 Ga. at 483 (3) (a). His accurate description of the economic realities of a contingent fee agreement were a part of that first determination. He thereafter turned separately to the requirement that the fees to be awarded had been incurred "from the date of the rejection of the offer of settlement through the entry of judgment." OCGA § 9-11-68 (b) (2).

Fees charged on an hourly basis can be evaluated by examining only post-rejection hours. But a contingent or flat fee cannot be broken down in the same way. Contingent and flat fees are not based on work done in increments of time, but on the value of the service as a whole. So for such fees, either the trial court's method or some other sort of two-step analysis is necessary.

Implicit in the majority opinion is the assumption that hourly fees are inherently superior to contingent (or flat) fees. It is difficult to see how, under the majority's analysis, fees under OCGA § 9-11-68 can be sustained if they cannot be demonstrated and calculated on an hourly basis. The majority disavows imposition

20

of a requirement of "tenth-of-an-hour record keeping" or of contemporaneous time records. But the majority refuses to defer to the trial court's fact finding as to the credibility of lead counsel's estimate of time spent. And the alternatives the majority would allow— examination of post-offer "preparation, discovery, motions practice, and hearings" amount to reconstruction of time records.

The statute does not say that. *Couch* does not say that. We should not say that.

On the contrary *Couch* expressly recognizes that the statute authorizes "fees based on a contingent fee agreement" and that a party seeking fees under OCGA § 9-11-68 can discharge the burden of proving "the value of the professional services actually rendered" by introducing evidence not only of rates and hours but alternately of "some other indication" of value. 295 Ga. at 483 (3) (a).

We have previously affirmed attorney fee awards based on contingency fee contracts when the plaintiffs submit evidence of "some other indication" of value than rates and hours. See, e.g., *Brock Built*, 316 Ga. App. at 715 (2) (b) (attorney's testimony that he charged plaintiff a 40 percent contingency fee; the submission of his "bills"; and his testimony that 40 percent is a customary fee was sufficient evidence that the contingency fee plaintiff agreed to pay was a valid indicator of the value of his attorney's services); *City of Atlanta v. Hofrichter/Stiakakis*, 291 Ga. App.

21

883, 889-890 (3) (663 SE2d 379) (2008) (written 40 percent contingency fee contract and attorney's testimony that such a fee was customary in that kind of case, that he and co-counsel had taken over 26 depositions and had spent hundreds of hours on the case, and that his firm had expended $38,948.04 in litigation expenses was sufficient to establish the contingency fee as the value of the professional services actually rendered and as reasonable); *Home Depot U.S.A. v. Tvrdeich*, 268 Ga. App. 579, 584-585 (2) (602 SE2d 297) (2004) (plaintiff's 40 percent contingency fee contract; attorney's testimony that such fee is customary; attorney's testimony that although he did not keep time records, and the case "probably got into five boxes and a full table of things[, a]nd it took a great deal of work, out-of-pocket expenses incurred" was evidence that the contingency fee plaintiff agreed to pay was a valid indicator of the value of her attorney's services).

The majority asserts that *Couch* "explicitly rejected" any approach that entails consideration of the reasonableness of a fee as a whole. That assertion is founded on a misreading of *Couch*. As detailed above, the trial court in that case had awarded "the full amount of fees provided by their contingency agreement[.]" 295 Ga. at 485 (3) (b). Since the trial court in that case made no effort to divide the fee into portions incurred before and after rejection of the offer, the Supreme Court had no occasion

22

in *Couch* to evaluate possible approaches to distinguishing portions of contingent fees incurred before rejection of an offer from those incurred after. Here, as detailed above, the trial court did divide the fee into portions incurred before and after rejection.

The majority labels invalid the trial court's method of distinguishing fees incurred after rejection from those incurred before. That method is invalid, the majority contends, because any effect a lawyer's efforts might have on the amount of a settlement or judgment is irrelevant to the "valu[e of] the actual work done." Indeed, the majority maintains, "[t]he amount of the $1 million settlement offer has (or should have) no direct relationship to the amount of work done up to that point; it should represent a measure of the expected damages award based on the plaintiff's injuries and the facts of the case."

If that were so, there would be no reason for anyone to hire a lawyer. Law is not art. Legal services are not purchased for their intrinsic value. "[N]o client is paying his lawyer for the hours he puts in;" they are paying for "the results [obtained]." Harry A. Ackley, *Let's Throw Out the Hourly Basis for Fees,* A.B.A. Journal 76, 76 (Jan. 1963). Settlement offers are not driven by the injuries and other

facts as such. They are driven by parties' expectations of what a judge or jury might do. Lawyering can change those expectations and those eventual outcomes.

Implicit in the majority opinion is the assumption that hourly rate billing is the only acceptable method of valuing legal services. We are barred from adopting that assumption by our Supreme Court's holding that the value of "professional services rendered" may be shown by "introduc[ing] evidence," not only "of hours [or] rates," but also of "some other indication of the value of the professional services actually rendered." *Couch*, 295 Ga. at 483 (3) (a).

Hourly rate billing is only one way to charge for legal services. And it is by no means a perfect method.

> Looked at broadly, there seems to be no easy answer as to the best fee arrangement. The billable hour, the flat fee, and the contingency fee all have their supporters, but all three also have their detractors. Critics argue that contingency fees are built on an inherent conflict of interest and that the arrangement can lead to windfall rewards for the lawyers. The flat fee has been criticized because it can pay the lawyer either too much or too little. And the billable hour has been criticized because of its susceptibility to abuse.

William Domnarski, *Swimming in Deep Water: Lawyers, Judges, and Our Troubled Legal Profession* 225 (ABA Publishing 2014). Indeed there is a substantial body of

commentary criticizing hourly rate billing. See generally, Sharlene W. Lassiter, *What Is a Lawyer Really Worth*, 25 Cumb. L. Rev. 23, 29 (1994-1995) (noting that hourly rates are an imperfect method of valuation); Stephen W. Jones & Melissa Beard Glover, *The Attack on Traditional Billing Practices*, 20 U. Ark. Little Rock. L. J. 293, 295 (1998) (noting that hourly fees can reward inefficiency); Noel Semple, *Measuring Legal Service Value*, 52 U. British Columbia L. Rev. 943 (2019) (noting that hourly rate billing is uninformative); David K. Higgins, *Hourly Rate Billing an Unnecessary Evil,* 2010 W. Va. Lawyer 26 (July/September 2010) (noting that hourly billing can reward inefficiency and can result in undervaluation, and compensation, of attorney services); Harry A. Ackley, *Let's Throw Out the Hourly Basis for Fees,* A.B.A. Journal 76 (Jan. 1963) (rejecting the idea that the value of legal services is derived from the amount of time spent working); Richard C. Reed, *It's Time to Think About Billing,* 13 Legal Econ. 28, 28 (Sept. 1987) (noting that hourly rates do not provide the value of services rendered but the cost to the attorney of rendering said services); William C. Cobb, *Competitive Pricing Along the Value Curve or, the Folly of Hourly Rate Pricing,* 14 Legal Econ. 29, 29 (Sept. 1988) (noting that clients do not tie value to raw hours worked); Ken Callander, *Value-Based Pricing Strategies: Collaborating with Your Clients While Differentiating Your Firm from the*

*Competition,* 41 No.1 ABA L. Prac. 36, 38 (January/February 2015) (noting that hourly fees often do not compensate attorneys for high-value services rendered).

The majority's remand for recalculation of the award consistent with its opinion leaves the parties and the trial court with little guidance. Presumably the trial court is not required to enter an award based on an hours-time-rate analysis and is still authorized, on remand, to enter an award "based on a contingent fee." *Couch,* 295 Ga. at 483 (3) (a). So what sort of showing "of hours, rates, or some other indication of the value of the professional services actually rendered," id., other than contemporaneous time records, will be acceptable? Does the examination of post-offer "preparation, discovery, motions practice, and hearings," have to be translatable into a number of hours? If not, what other measures are acceptable? And if the trial court's examination of that evidence is translated into an estimated number of hours, what standard must that estimate meet in order to be reviewed under the any-evidence standard and not be dismissed by this court as "essentially guesswork"? What standards is the trial court to apply in evaluating rates, and what deference, if any, will the majority accord findings in that regard?

The trial court gave due considerations to the evidence and the arguments of counsel. He complied with the requirements of the statute and controlling case law

26

and exercised his discretion within the boundaries of that controlling law. Whether or not we would have made the same decision, we are bound to affirm.

This is a hard case. It is hard because OCGA § 9-11-68 (b) sets out a hard rule. As the majority correctly notes, its penalty falls with full force on parties whose ill-fated decision to reject an offer was entirely reasonable and in good faith. For some litigants, that penalty might well be ruinous.

And it is hard because this outcome is troubling. The verdict is strikingly large, and the case might well have ended in a defense verdict. Indeed a fair-minded reader might well conclude that it should have ended in a defense verdict. And the majority makes a credible showing that but for want of certain objections that should have been made and granted, a very different result might well have obtained. But that is not for us to decide.

I am authorized to state that Presiding Judge Barnes, Presiding Judge Miller, Presiding Judge Reese, and Senior Appellate Judge Herbert E. Phipps join in this dissent and that Judge Markle concurs in judgment only as to this dissent.